**ELLSWORTH ASSOCIATES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Anteon Corporation, Intervenor.**

No. 99–790C.

United States Court of Federal Claims.

Nov. 22, 1999.[1]

1. This opinion was issued under seal on November 4, 1999. Pursuant to ¶3 of the ordering language, the parties identified protected/privileged material subject to deletion. Brackets denote the deleted material.

L. James D'Agostino, McLean, VA, for plaintiff. Richard L. Moorhouse, Reed, Smith, Shaw & McClay, LLP, Washington, DC, and Leigh T. Hansson, Reed, Smith, Hazel & Thomas, LLP, McLean, VA, of counsel.

Lisa B. Donis, Washington, DC, with whom was Acting Assistant Attorney General David W. Odgen, for defendant.

William L. Walsh, Jr., McLean, VA, for intervenor. J. Scott Hommer III, Paul N. Wengert, and Sharon L. Larkin, Venable, Baetjer, and Howard, LLP, McLean, VA, of counsel.

## OPINION

MILLER, Judge.

This post-award protest is before the court after a hearing and argument on cross-motions for summary judgment on the administrative record. The principal challenge levied is that the evaluation following a solicitation of a price schedule failed to conform to the requirements for a negotiated procurement.

## FACTS

On July 21, 1999, the Child Care Bureau, Administration on Children, Youth, and Families, Administration for Children and Families of the Department of Health and Human Services ("HHS"), issued, via e-mail, a solicitation for the Child Care Information System Technical Assistance Project (the "project"). The procurement was to be conducted under 48 C.F.R. (FAR) § 8.4 (1998), which governs agency acquisitions made pursuant to the Federal Supply Schedule program ("FSS program"). The letter announcing the solicitation, transmitted to prospective contractors on the FSS, contemplated a three-phase evaluation process to determine the contractor best suited to meet HHS' needs. First, contractors were asked to respond electronically, by August 2, 1999, to the questionnaire attached to the solicitation. The questionnaire listed the evaluation criteria and the weight to be given to each factor in scoring the maximum of 100 points. Second, those contractors judged to be minimally competent were to be contacted for an interview. The solicitation, however, did not inform contractors of the evaluation criteria or the scoring applicable to the interviews. Finally, selected contractors were to be invited to submit cost proposals. The role of these proposals in the overall selection was not described in the solicitation documents. The weight to be given to each phase in the final selection process was not stated, nor did the solicitation indicate that HHS would award the contract to the contractor who achieved the highest overall score in final evaluation.

Based upon its scoring of the questionnaires, the evaluation team excluded one contractor and invited Ellsworth Associates, Inc. ("plaintiff"), and Anteon Corporation ("intervenor") to participate in the interview phase. The scorers of the questionnaires gave plaintiff [ ] and intervenor [ ]. Thereafter, the questionnaire scores played no part in the selection process.

The interview invitations, e-mailed to contractors on August 6, 1999, listed topics the evaluation team wanted each contractor to address during its presentation. Because the evaluation team had different concerns about each contractor's questionnaire responses, these invitations were not identical. The invitations asked both plaintiff and intervenor to (1) "provide an overview of proposed project activities/strategies and timelines," (2) "provide detailed information about proposed staffing, hours and costs related to the contract tasks," (3) "describe staff roles and responsibilities and their relationship to the labor categories listed in the proposal," and (4) "provide additional information on tribal experience of current staff." HHS' invitation further asked plaintiff to provide (1) "detailed information about the roles and responsibilities, hours, and cost of the management team," (2) "an organizational chart and staff loading chart for all staff assigned to the project," (3) "additional information on the child care-related experience of liaisons," (4) "information about the complexity of previous projects managed by [plaintiff]," (5) "additional detail concerning how [plaintiff] would work with NAMS," (6) "strategies [plaintiff would] implement to ensure high quality web architecture and design," and (7) "the actual retention rate and [ ] specific

strategies [plaintiff] uses to retain project staff over the life of a project." HHS' invitation also asked intervenor to provide (1) "a demonstration of the 'Child Care Program Viewer' and the '4 Steps to Quality Child Care' mentioned in the questionnaire response," (2) "additional detail concerning how [intervenor] would work with NCCIC," (3) information concerning "how [intervenor would] work with the current contractor who is completing the work on the Federal Child Care Information System," and (4) an explanation of whether "technical support specialists under the contract with the [BIA would] be assigned (full/part time) to work for/with CCISTAP."

As the interviews were completed, HHS, consistent with the solicitation, asked the contractors to submit cost proposals. Plaintiff submitted a revised price of [ ] and intervenor, [ ]. The wide variance between these figures is apparently attributable to the personnel, or full-time equivalents (FTEs), that each contractor determined to be necessary to complete the project. While plaintiff proposed [ ] FTEs, intervenor proposed [ ] FTEs. Sometime after the interviews were completed, but before they were scored, the cost proposals were distributed to the members of the evaluation team.

One week after the evaluation team completed the interviews, it met to determine which contractor's proposal represented the best value and lowest-cost alternative for the Government. During its discussion of the interviews, the evaluation team decided that it would be helpful to assign weight to certain evaluation criteria and score each contractor on that basis. The following maximum scores were assigned to the evaluation criteria: 5 points for "General Presentation (clarity, organization)," 60 points for "Competence of proposed strategies," 6 points for "Experience/capabilities/resources of company," 6 points for "Capability and experience of proposed staff," and 3 points for "Answering of posed questions (comprehensiveness, clarity, appropriateness of response)." After a discussion each member of the evaluation team

scored the contractors based on these criteria. The scores were totaled and then averaged, with plaintiff receiving [ ] and intervenor [ ].[2] At this time the evaluation team also discussed the cost proposals. The evaluation team finally determined that intervenor's proposal was superior.

Upon discovering that it would not be awarded the contract, plaintiff requested a pre-award debriefing. At the debriefing, held on September 10, 1999, plaintiff was informed that the evaluation team [ ]. On September 13, 1999, consistent with the evaluation team's decision, HHS awarded FSS No. GS–35F–4357D to intervenor.

On September 16, 1999, plaintiff filed a formal bid protest with the General Accounting Office (the "GAO"). Although the protest was filed within ten days of the award, HHS did not suspend contract performance, as required by FAR § 33.104(c)(1). On September 24, 1999, per FAR § 33.104(c)(2), the Deputy Assistant Secretary for Grants and Acquisitions Management asserted the existence of special circumstances permitting performance to continue on the contract pending resolution of the GAO protest.

On September 30, 1999, plaintiff filed the instant action seeking injunctive and declaratory relief. The complaint charges that HHS (1) unlawfully used unstated evaluation criteria in violation of federal acquisition regulations, (2) improperly awarded the contract to an unqualified contractor, and (3) improperly lifted the statutory stay on contract performance. The relief plaintiff requests is termination of the existing contract and reinstitution of the competitive bidding process in accordance with applicable regulations.

On September 30, 1999, plaintiff also requested a temporary restraining order enjoining HHS and intervenor from continued performance on the contract. The court denied this motion from the bench—memorializing the decision in an order entered on October 1, 1999—and concurrently denied plaintiff's oral request for discovery. *See*

---

**2.** The administrative record contains the scoring results for the interviews. However, individual evaluators' notes for the interviews—which were available for the questionnaires—either were not prepared or are not now available. The aggregate scores, prepared at the meeting of the evaluation team one week later, are available.

Transcript of Proceedings, *Ellsworth Assocs., Inc. v. United States*, at 81 (Fed.Cl. Sept. 30, 1999). The order consolidated the hearing on the merits with plaintiff's request for preliminary injunctive relief and set an expedited briefing schedule. On October 6, 1999, pursuant to that schedule, defendant filed the administrative record, which it supplemented on October 18, 1999, and again on November 4, 1999. Plaintiff moved for leave to amend the complaint on October 13, 1999; the motion was denied in part by order entered on October 26, 1999. Plaintiff moved for discovery on October 15, 1999. The court granted the motion by order entered on October 26, 1999, for depositions of the contracting officer, the HHS Acting Commissioner for Child Care, and the program manager, but otherwise denied the motion.

On October 13, 1999, defendant filed its motion for summary judgment on the administrative record and opposition to plaintiff's motion for a preliminary injunction. Defendant argues that summary judgment is appropriate because plaintiff could not prove a violation of the relevant procurement regulations necessary to overturn the contract award. On that same date, intervenor filed its motion for summary judgment, joining in defendant's motion, and its opposition to plaintiff's motion for a preliminary injunction on essentially identical grounds. Plaintiff cross-moved for judgment on the record, arguing that HHS' decision to award the contract to intervenor was arbitrary, capricious, and an abuse of discretion.

## DISCUSSION

### 1. *Standard of review for post-award bid protests*

In 1996 Congress amended the Tucker Act to grant the Court of Federal Claims jurisdiction to entertain post-award bid protest actions. *See* 28 U.S.C.A. § 1491(b) (West 1994 & Supp.1999). The amendment establishes the appropriate standard of review. *See* 28 U.S.C.A. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). Pursuant to this standard, the court can hold unlawful, and set aside, an agency action which is "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994). This standard is identical to that which the Court of Federal Claims has traditionally applied in pre-award bid protests. *See GraphicData, LLC v. United States*, 37 Fed.Cl. 771, 779 (1997).

 In order to prevail under the arbitrary and capricious standard, a frustrated bidder is required to establish that (1) the Government officials involved in the procurement process were without a rational and reasonable basis for their decision, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes and regulations. *See Statistica Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed.Cir.1996); *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed.Cir.1988); *GraphicData*, 37 Fed.Cl. at 779. To succeed under either test, a plaintiff must prove the arbitrary and capricious nature of the Government's actions by a preponderance of the evidence. *See R.R. Donnelley & Sons, Co. v. United States*, 38 Fed.Cl. 518, 521–22 (1997); *PCI/RCI v. United States*, 36 Fed.Cl. 761, 767 (1996); *Stapp Towing, Inc. v. United States*, 34 Fed.Cl. 300, 305 (1995); *C & G Excavating, Inc. v. United States*, 32 Fed.Cl. 231, 235 (1994); *Logicon, Inc. v. United States*, 22 Cl.Ct. 776, 783 (1991).

 With respect to an agency procurement decision that is argued to be irrational and unreasonable, the scope of review is very limited. *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). Courts must give great deference to agency procurement decisions and will not lightly overturn them. *See id.; GraphicData*, 37 Fed.Cl. at 782. In the context of a bid protest, an agency is entitled to wide discretion in its evaluation of bids. *See Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1046 (Fed.Cir.1994); *CACI Field Servs., Inc. v. United States*, 13 Cl.Ct. 718, 725 (1987), *aff'd*, 854 F.2d 464 (Fed.Cir. 1988). The reviewing court thus is not permitted to substitute its judgment for that of the agency. *See generally Scanwell Lab., Inc. v. Shaffer*, 424 F.2d 859, 865–73

(D.C.Cir.1970); *Stapp Towing*, 34 Fed.Cl. at 306. The court's only role is to determine whether any rational and reasonable basis supports the agency's decision. *See Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203 (1974). In this regard the existence of minor errors or oversights in the evaluation process is not sufficient. *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir.1996). "It is indisputable that the ultimate grant of a contract must be left to the discretion of a government agency." *Scanwell Lab.*, 424 F.2d at 869. However, "[i]t is also incontestable that this discretion may not be abused." *Id.*

■■■■ With respect to an agency procurement decision alleged to be in violation of applicable statutes or regulations, plaintiff must do more than raise an issue concerning a violation of any law. *See Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 64, 617 F.2d 590, 597 (1980). A protestor plaintiff is not required to show that "but for the alleged error the protestor would have been awarded the contract." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996). "Rather, the protestor must only show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999) (quoting *Statistica*, 102 F.3d at 1582).

■■■■ Once a plaintiff shows that a procurement was unlawful, the court must determine whether to grant a permanent injunction. *See FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir.1993). An injunction is an extraordinary remedy that is not granted as a matter of course. *See id.* To warrant injunctive relief, plaintiff must establish: (1) actual success on the merits, (2) irreparable injury if injunctive relief were not granted, (3) that the harm to plaintiff if an injunction were not granted outweighs the harm to the Government and third parties if an injunction were granted, and (4) that granting injunctive relief serves the public interest. *See id.* No one factor is dispositive on this score. *See id.*

### 2. *Standard of review for judgment on the administrative record*

Motions for judgment on the administrative record are treated in accordance with the rules governing motions for summary judgment. *See Nickerson v. United States*, 35 Fed.Cl. 581, 588 (1996). Although factual disputes may percolate throughout an administrative record, the salient inquiry is whether the record substantiates a preponderance of evidence to uphold the procurement decision. Extra-record evidence is admitted when a gap, inadequate explanation, or inconsistency is present that requires explanation. *See GraphicData*, 37 Fed.Cl. at 779 (citing *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989)).

### 3. *Clear and prejudicial violation of procurement regulations*

Plaintiff asserts that HHS violated relevant procurement regulations in two ways. Plaintiff first contends that HHS' failure to state the relative weight assigned to the interview process and the price proposal in the overall assessment of the bids was unlawful. Second, plaintiff contends that HHS' failure to communicate the evaluation criteria for scoring of the interviews to the contractors in advance violated applicable regulations. These omissions, plaintiff claims, significantly prejudiced its proposal.

#### 1) *Applicable regulations*

■■■■ The parties, as an initial matter, disagree as to which set of regulations are applicable to this contract award. The letter accompanying the solicitation states, in unambiguous terms, that this procurement was to be awarded under FAR Part 8. Part 8 governs agency acquisitions made pursuant to the FSS program. *See* FAR § 8.401. The FSS program "provides Federal agencies with a simplified process for obtaining commonly used commercial supplies and services at prices associated with volume buying." FAR § 8.401(a). This objective is accomplished by allowing the agency to select products and services from a list of eligible contractors whose pricing schemes have been pre-approved by GSA. *See id.* The process is "simplified" because, in an FSS procure-

ment, the agency need not comply with the comparatively more formal and arduous procedures for contracting by negotiation set forth in Part 15, FAR § 15.000. *See* FAR § 8.404(a). Because the "GSA has already determined the prices of items under [the FSS program] to be fair and reasonable," agencies "need not seek further competition [or] synopsize the[ir] requirement." *Id.*

Although the contract was originally envisioned as an FSS order, plaintiff asserts that HHS actually conducted it as a competitive negotiated procurement. Plaintiff then cites a trinity of decisions by the Comptroller General for the proposition that, once an agency elects to use an approach which is more like a Part 15 negotiated procurement than a straight Part 8 FSS buy, it must adhere to the procedural requirements of Part 15. Defendant and intervenor rejoin that, as a factual matter, HHS conducted the procurement from start to finish in accordance with Part 8. Alternatively, they argue that plaintiff misreads the case law and that agency conduct cannot transform an FSS buy into a negotiated procurement. The distillation of their argument is that, although HHS chose to utilize some more formal elements typically used in a negotiated procurement in its evaluation process, HHS was not required to conform with Part 15 in conducting the solicitation.

Stating that only contractors on the GSA schedule would be eligible, the first sentence of the July 21, 1999 letter accompanying the solicitation signals HHS' intention that the contract be awarded pursuant to the FSS program. The overall brevity and informality of the solicitation is also more consistent with an FSS buy than a Part 15 negotiated procurement. In the one-page letter accompanying the solicitation, HHS explains the project requirements in a single sentence and devotes less than a paragraph to explaining the selection process. A solicitation in a negotiated procurement typically includes a far more detailed statement of the project requirements, an explanation of the selection process, and a guide for scoring criteria.

The record gives no ballast to the notion that plaintiff, an experienced government contractor in the field, was misled as to the nature of this procurement. On the signature page of its own cost proposal, plaintiff notes the level of price reduction it is offering pursuant to FAR § 8.404(b)(3). Section 8.404(b)(3) mandates that the agency seek a price reduction from contractors when they order a quantity over and above that scheduled for by GSA in an FSS buy. This provision is only applicable to Part 8 orders and is not relevant to Part 15. Plaintiff's own statement undercuts its professed belief that this was a negotiated procurement. Thus, as a factual matter, the procurement was not conducted as a negotiated procurement under Part 15.

The decisional law [3] does not support plaintiff's contention that an FSS selection process that is handled more like a negotiated procurement must comply with the requirements of Part 15. Plaintiff relies upon language in *COMARK Federal Systems*, 98–1 CPD ¶ 34, at 5, its strongest case, stating that "[w]here the agency intends to use the vendors' responses as the basis of a detailed technical evaluation and cost/technical trade-off, the agency has elected to use an approach that is more like a competition in a negotiated procurement than a simple FSS buy, and the [solicitation] is therefore required to provide for a fair and equitable competition." *Id.* However, the next sentence of the opinion clarifies that, to comply with this standard, "an agency need not identify detailed evaluation criteria [but only] indicate, at a minimum, the basis on which the selection is to be made." *Id.* Because a negotiated procurement requires identification of detailed evaluation criteria, the *COMARK* decision does not support the proposition that the procedural requirements of Part 15 must be imposed on an FSS procurement in which the agency intends to perform a detailed technical evaluation and cost/technical trade-off. Plaintiff also cites *Nautica International, Inc.*, 93–2 CPD ¶ 321, for the same proposition. *Nautica* states:

---

**3.** When the GAO has dealt with similar situations in the past, their opinions are not binding on this tribunal, but such decisions when reasonable and persuasive provide useful guidance to the court. *Logicon*, 22 Cl.Ct. at 786 (citing cases).

First while an agency is not obligated to seek competition where it may issue an order under the FSS, we think that once it invites firms to submit quotes, it has an obligation to describe its needs accurately, so that all vendors may compete on a common basis. *Armour of Am.*, B–237690, Mar. 19, 1990, 90–1 CPD ¶ 304; *Spacesaver*, B–224339, Aug. 22, 1986, 86–2 CPD ¶ 219. Having invited competition, albeit on an informal basis, the agency must treat vendors consistent with the concern for a fair and equitable competition that is inherent in any procurement. *See Brennan Assocs., Inc.*, B–231859, Sept. 28, 1988, 88–2 CPD ¶ 295. We think the agency's failure to state its needs unambiguously prevented Nautica from submitting a competitive quote and that Nautica was prejudiced by the agency action.

The court concludes that neither case supports plaintiff's position.

The third case relied on by plaintiff warrants special attention, not for its significance to the case at bar, but for its irrelevance. Plaintiff cites *Amdahl Corp.*, 98–2 CPD ¶ 161, for the strong proposition that "where an agency conducts a competition between existing FSS contract holders, the agency's actions will be treated as if it were a FAR Part 15 procurement to ensure that the evaluation was reasonable and consistent with the terms of the solicitation." Plf's Br. filed Nov. 4, 1999, at 4. The opinion recites the less ambitious proposition:

> Where, as here, an agency conducts a competition, however, we will review the agency's actions to ensure that the evaluation was reasonable and consistent with the terms of the solicitation. *Information Sys. Tech. Corp.*, B–280013.2, Aug. 6, 1998, 98–2 CPD ¶ 36 at 3; *COMARK Fed. Sys.*, B–278343, B–278343.2, Jan. 20, 1998, 98–1 CPD ¶ 34 at 4–5. The fact that a protester does not agree with the agency's evaluation does not render the evaluation unreasonable. *Tracor, Inc.*, B–250716.2, Feb. 23, 1993, 93–1 CPD ¶ 165 at 7.

*Amdahl Corp.*, 98–2 CPD ¶ 161, at 2. Plaintiff's proposition that Part 15 standards must be imported into an FSS procurement when an agency chooses to solicit and base its evaluation on detailed information from the contractors amounts to an unwarranted embellishment of the decisional law.

In contrast to those cited by plaintiff, intervener cites two decisions that are more germane to the current dispute. In *Intelligent Decisions*, 97–1 CPD ¶ 19, the GAO denied a contractor's protest where the agency had engaged in supplemental discussions with the ultimate awardee, but refused to give the protester the same opportunity. The GAO reasoned that these discussions, which would have been prohibited in a Part 15 negotiated procurement, were not objectionable in the context of an FSS buy. Similarly, *CPAD Technologies*, 98–1 CPD ¶ 55, denied a protester's complaint that an FSS award was unlawful because the agency failed to engage in formal source-selection procedures. The GAO concluded that "[plaintiff's] assertions that it was improper for the agency to satisfy its requirements by placing an order under an FSS contract, and that formal notice and selection procedures were required, are simply legally incorrect." *CPAD Technologies*, 98–1 CPD ¶ 55, at 2. These cases recognize the fact that Part 8 authorizes more flexible and less formal procedures than those required in a negotiated procurement. The court holds that an FSS buy cannot be transformed into a negotiated procurement under these facts.

The purpose of the FSS program is to provide federal agencies with a simplified process for obtaining certain goods and services. *See* FAR §§ 8.401, 8.404(a). When agencies take this approach, no requirement mandates that contractors receive any advance notice of the agency's needs or the selection criteria. *See* FAR § 8.404(a). Because Part 8 contemplates agencies ordering off the schedule, no regulations govern the proper procedure for selecting contractors. *See* FAR § 8.401. This is consistent with the simplified and flexible approach Part 8 takes toward procurements. To be sure, within the FSS program an agency may choose, for any number of reasons, to engage in a more comprehensive selection process than contemplated by the scheme. When that occurs, a frustrated bidder may still challenge the agency award under the arbitrary and capri-

cious standard articulated in 5 U.S.C. § 706(2)(A). However, the protester will not be able to prevail on the theory that the procurement procedure involved a clear and prejudicial violation of applicable statutes and regulations, because no applicable procedural regulations are contained in Part 8. A protester instead must rely on establishing that the government officials involved in the procurement process were without a rational and reasonable basis for their decision.

### 2) Prejudice

█ Assuming that the FSS order at issue here could be transmogrified into a negotiated procurement and a violation of Part 15 had been proved, the court would be required to address plaintiff's claim of prejudice. "[I]f one thing is plain in this area it is that not every irregularity, no matter how small or immaterial, gives rise to the right to be compensated." *Keco,* 203 Ct.Cl. at 573, 492 F.2d at 1203. To prevail in a post-award bid protest, plaintiff "must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp.,* 78 F.3d at 1562; *see also Central Ark., Maintenance, Inc. v. United States,* 68 F.3d 1338, 1342 (Fed.Cir.1995); *Cleveland Telecomm's, Corp. v. Goldin,* 43 F.3d 655, 659 (Fed.Cir.1994); *CACI Field Servs.,* 854 F.2d at 466. Prejudice requires plaintiff to "show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval,* 175 F.3d at 1367 (quoting *Statistica,* 102 F.3d at 1582). The court holds that plaintiff has failed to meet this burden.

█ Plaintiff first argues is that it was prejudiced because HHS failed to indicate that the interview and cost proposal phases of the selection process would be factors in the award. Believing that their proposals would be judged on the basis of the questionnaire alone, plaintiff insists that it was not as attentive as it would have been to these other elements. Contrary to plaintiff's assertion, made repeatedly during the course of this litigation, a fair reading of the solicitation indicates that a three-phase selection process was contemplated. The solicitation put contractors on notice that the interview and cost proposal would be factors in the evaluation criteria, so plaintiff suffered no prejudice on this basis.

█ Plaintiff next argues that, assuming that the solicitation did indicate that the interview would be a factor in the selection process, it was prejudiced because HHS failed to state the evaluation criteria for the interview. Had plaintiff known the evaluation criteria in advance, the argument goes, plaintiff could have tailored its interview specifically to address the evaluation factors. However, the e-mail invitations to both plaintiff and intervenor for the interview phase did establish guidelines for the evaluation of the interviews such as strategy and timeline for project completion, the roles and responsibilities of proposed staff, the costs of particular contract tasks, the relationship of proposed staff to labor categories in the proposal, and the tribal experience of current employees. Although the e-mails were not identical, the differences are explained by HHS' desire to focus the contractors on perceived shortcomings in their individual proposals and performance issues, as revealed by the questionnaire responses, which were particular to each contractor's ability to perform. Nothing in the regulations precludes an agency, within the context of a competitive procurement, from asking a contractor to explain any special concerns that arise from its proposal or unique situation. The court holds that the common elements of the e-mail invitations provided both contractors with adequate guidance as to the evaluation criteria to be used during the interview.

█ Plaintiff's third argument is that, assuming the solicitation did indicate that the cost proposal would be a factor in the evaluation process, plaintiff was prejudiced because HHS failed to state the criteria under which it would consider cost proposals and the relative weight to be given to this factor in scoring. Specifically, plaintiff complains that had it been aware of the importance of cost in the overall selection, plaintiff would have restructured its cost proposal. Plaintiff has not substantiated that more knowledge of the actual role of price in the evaluation would have signaled it to reduce its cost proposal. According to plaintiff, "had [plaintiff] known

the significance price was to play in the overall evaluation, reason dictates that [plaintiff] likely would have lowered its price and proposed a less technically superior proposal." Plf's Br. filed Nov. 4, 1999, at 19. However, the interview invitation alerted plaintiff that its proposed staffing was [ ] and, perhaps, [ ]:

> Provide detailed information about proposed staffing, hours and costs related to the contract tasks. Describe staff roles and responsibilities, and their relationship to the labor categories listed in the proposal. [ ]. Please provide detailed information about the roles and responsibilities, hours, and cost of the management team.

Moreover, the argument that plaintiff, an experienced government contractor, was unaware that price would be a significant factor in the ultimate selection strains credulity. After all, this was an FSS procurement, which reflects, per FAR § 8.404(a): "By placing an order against a schedule using the procedure in this section, the ordering office has concluded that the order represents the best value and results in the lowest overall cost alternative (considering price, special features, administrative costs, etc.) to meet the Government's needs." Thus, plaintiff was not prejudiced by violation of regulations.

### 4. *Irrational and unreasonable procurement decision*

Plaintiff asserts that HHS lacked a rational and reasonable basis for its award of the contract to intervenor for two reasons. Plaintiff first cites HHS' failure to follow the process outlined in the solicitation. Second, plaintiff contends that HHS' decision was irrational and unreasonable because intervenor was incapable of performing on the contract.

### 1) *Failure to follow the process*

 Plaintiff levies the charge that HHS failed to abide by its own process by calling for the cost proposals before scoring of the interviews had been completed. The solicitation contemplated a three-phase process, with the interviews to precede submission of the cost proposals. HHS received the cost proposals on September 17, 1999, after it conducted interviews, but before they were scored. Not only had HHS received the costs proposals, but it distributed them to the evaluation team before they scored the interviews. Plaintiff argues that because the contractors' cost proposals were distributed to the evaluation team before they met to score the interviews, the evaluations may have been skewed in intervenor's favor due to the price disparity in the two proposals. This irregularity, plaintiff argues, could have affected the ultimate outcome of the award.

Plaintiff's argument, although logical as far as it goes, rests on the assumption that the scoring of the interviews was an integral part of awarding the contract. Plaintiff's surmise is correct that having the evaluators see the cost proposals could have skewed their scoring. However, the solicitation did not call for scoring of the interviews or the cost proposals. The procurement process was never constructed to award the contract to the applicant with the highest total score—which explains why the cost proposals were not scored. The procurement process was structured so that the evaluation team could establish the best value among several contractors. This necessarily involved an *ad-hoc*, subjective determination based on all relevant factors. The interview scoring was an internal process implemented for the convenience of the evaluation team during the discussion of interviews and prices that led to the award decision. Because the selection process, as described in the solicitation, was designed so the team could make an informed final judgment, based on the best value to the agency, that the cost proposals were distributed to the evaluators before the interviews were scored was not significant in the ultimate selection.

Plaintiff's second contention is that HHS' decision to award the contract to intervenor was irrational and unreasonable because HHS weighed [ ] so significantly in the interview process without informing the contractors, in advance, that it would play such an important role in the ultimate selection. Had plaintiff had known that [ ] would have projected a different structure for its

interview answers. HHS' failure to alert the contractors to this fact, plaintiff argues, disadvantaged its proposal and could have prevented it from winning the award.

Plaintiff again relies on assumptions about the procurement process that are not supported by the evaluation that took place. Interview scoring was an internal process that occurred one week after the interviews during a discussion among the evaluation team members. The notion that [ ] of the interview score is not accurate. In a statement made as a *post-hoc* justification at the pre-award debriefing, Program Manager Linda B. Adams listed as a "con" for plaintiff [ ]. It is now clear that [ ] comprehended "competence of proposed strategies," not [ ] a term that appears in a summary document, Evaluation of Presentation transmitted by letter of August 30, 1999, from Frank Fuentes, Deputy Associate Commissioner for the Child Care Information System to Contract Specialist (Contracting Officer) Arthur L. Storey. "Competence of proposed strategies" was stated prominently in the solicitation and highlighted in the invitations to the interview. In these circumstances it was neither irrational nor unreasonable for the evaluation team to weigh this factor so significantly.

### 2) *Decision to award to intervenor*

Plaintiff charges that HHS lacked a rational and reasonable basis for its decision to award the contract at issue because intervenor is incapable of completing performance on the contract. In support of this contention, plaintiff first cites intervenor's lack of experience in providing reporting, training, and information systems technical assistance at a federal level. Second, plaintiff asserts that intervenor lacks the requisite personnel to staff the project adequately and speculates that, once awarded the contract, intervenor plans to "expropriate" plaintiff's staff to fill its needs. Plf's Br. filed Sept. 30, 1999, at 10.

As the record demonstrates, intervenor is an established government contractor with experience in both child care and related fields. Intervenor documented during the procurement process no fewer than five different reporting and information system projects, including projects with federal, state, and local governments, in which it was involved. The solicitation asked the contractors to document [ ]. This record, coupled with the significant experience of [ ] amply supports HHS' evaluation.

Plaintiff's second contention is not supported by the evidence. The solicitation did not contemplate that contractors would have [ ]. The questionnaire obviously anticipates [ ]. That intervenor did not have the required [ ], thus, would not have precluded the award. Furthermore, intervenor offered the agency a realistic assessment of its [ ]. Plaintiff's evidence that HHS' decision to award the contract to intervenor was irrational and unreasonable is woefully inadequate to disturb the award.

### 5. *Injunctive relief*

#### 1) *Success on the merits*

In light of the foregoing discussion, plaintiff has failed to show actual success on the merits.

#### 2) *Irreparable harm*

The Court of Federal Claims previously has held that a disappointed contractor suffers irreparable harm because it is deprived of lost profits under the contract at issue. *See, e.g., Essex Electro Eng'rs, Inc. v. United States,* 3 Cl.Ct. 277, 287 (1983), *aff'd,* 757 F.2d 247 (Fed.Cir.1985). Absent an injunction a plaintiff would be entitled to recover only bid-preparation costs, not lost profits, through an action at law. *See id.* As this remedy is inadequate, plaintiff has satisfied the requirement of showing irreparable injury. Support also exists for the notion that the denial of the right to have its bid fairly and lawfully considered constitutes irreparable injury. *See National Maritime Union of Am., AFL–CIO v. Commander Military Sealift Command,* 824 F.2d 1228, 1237 (D.C.Cir.1987); *Dairy Maid Dairy, Inc. v. United States,* 837 F.Supp. 1370, 1381 (E.D.Va.1993); *Abel Converting, Inc. v. United States,* 679 F.Supp. 1133, 1142 (D.D.C.1988).

### 3) *Balance of hardships*

In considering whether to grant injunctive relief, the court is next required to balance the hardships imposed on the HHS and any third parties of reinstituting the evaluation process against the harm to plaintiff from the unlawful award. Certainly the delay and inconvenience to be anticipated in the normal course of resoliciting the bid would impose significant burdens on HHS and intervenor. However, only in an exceptional case would these factors alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests. This is the exceptional case. Plaintiff's weakness on the merits renders the disruption of contract performance unwarranted.

### 4) *Public interest*

Lastly, the court considers the public interests at stake. Widespread support exists for the proposition that the public interest in protecting the integrity of the procurement system is well served by granting a permanent injunction. *See Scanwell Lab.,* 424 F.2d at 866–67; *PCI/RCI,* 36 Fed.Cl. at 776. Moreover, a public interest is manifest in ensuring that the Government closely adhere to the requirements of the procurement regulations. *See Scanwell Lab.,* 424 F.2d at 866–67. It is equally clear that assuring the timely completion of government contracts and protecting the public fisc are strong public interests. *Logicon,* 22 Cl.Ct. at 795–96. In this case plaintiff's cost proposal was over [ ] than intervenor's. In making the award, the evaluation team was required by law to assess which contractor presented the best value, at the lowest cost to the Government. The public interests favor defendant and intervenor.

### CONCLUSION

Accordingly, based on the foregoing,

1. Defendant's and intervenor's motions for judgment on the administrative record are granted. Plaintiff's cross-motion for judgment on the administrative record is denied.

2. The Clerk of the Court shall enter judgment for defendant and intervenor.

3. By November 19, 1999, the parties shall file requests for deletion of protected/privileged material before the court issues its opinion for publication.

4. The court's chambers transmitted a copy of this opinion to the parties by facsimile transmission this date.

**IT IS SO ORDERED.**

No costs.