**TRANSATLANTIC LINES LLC, Plaintiff,**

v.

**UNITED STATES of America, Defendant,**

**and**

**Strong Vessel Operators, LLC, Intervenor.**

No. 05–866C.

United States Court of Federal Claims.

Filed: Sept. 30, 2005.

Reissued for Publication Oct. 13, 2005 [1].

Brian A. Bannon, David A. Leib, Blank Rome, LLP, Washington, D.C., for plaintiff.

Christian J. Moran, Commercial Litigation Branch, Civil Division, United States Depart-

1. This Opinion was issued under seal on September 30, 2005. The parties do not object to its being released for publication with redactions as indicated.

ment of Justice, Washington, D.C., for defendant.

Heather M. Spring, Sher & Blackwell, LLP, Washington, D.C., for intervenor.

## ORDER AND OPINION

HODGES, Judge.

This is a post-award bid protest. Plaintiff TransAtlantic entered a contract with the Department of the Army, Military Surface Deployment and Distribution Command to transport cargo between Florida and Guantanamo Bay beginning in 2002. The Government awarded the new contract to intervenor Strong Vessel Operators. Plaintiff disputed the award because of alleged violations of procurement statutes and regulations. Strong Vessel intervened.

The issues in this case are (1) whether the contracting officer made a reasonable effort to insure that Strong Vessel's refrigerated cargo containers would meet the standards called for in the solicitation; and (2) whether the Agency allowed Strong Vessel to avoid Small Business Administration regulations governing limitations on labor costs. The contracting officer did not make a reasonable inquiry to insure that Strong Vessel's refrigerated cargo containers met the Government's needs; and he did not enforce statutes and regulations applicable to small business concerns.

We grant plaintiff's petition for an order enjoining defendant from awarding this contract to intervenor Strong Vessel Operators. The parties will meet with the court as soon as possible to discuss appropriate remedies or other means of resolving this matter.

## BACKGROUND

The Military Surface Deployment and Distribution Command is a Department of the Army agency responsible for transportation of equipment and supplies for military personnel around the world. The contract at issue is a firm, fixed-price requirements contract for transportation of cargo from Jacksonville, Florida to military personnel stationed in Guantanamo Bay, Cuba. It is a 100% set-aside for small business.[2]

Defendant issued a Request for Proposals in October 2004 with three evaluation criteria. These were technical capability, past performance, and price. Technical capability was more important than past performance, and the two factors together were approximately equal to price. The Agency announced in April 2005 that Strong Vessel submitted the winning proposal for an estimated $16.1 million.

Plaintiff filed a protest with the General Accounting Office, contending that Strong Vessel did not meet the requirements of the solicitation in two respects: (1) A small business concern awarded a set-aside contract for services must pay at least fifty percent of its labor costs on the contract to its own employees. Plaintiff alleged that Strong Vessel did not meet this SBA set-aside requirement. (2) Strong Vessel did not meet a technical requirement that the offeror provide refrigerated cargo containers that would insure the safety of perishable goods during transit. The equipment was to include a generator that would permit the system to be self-sustaining aboard ship, so the goods would survive if the barge lost power at sea.

The GAO denied plaintiff's protest in July 2005, ruling that plaintiff's allegations regarding SBA set-aside requirements were untimely, and that the contracting officer reasonably determined that Strong Vessel's refrigerated containers would be self-sustaining. Plaintiff sued here in August 2005.

## APPLICABLE LAW

We review bid protests according to standards enacted as part of the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320. See 28 U.S.C. § 1491(b). The Act provides that an "interested party" may file an objection to "a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28

2. A business concern is qualified a small business for these purposes if it meets certain size criteria set out in the Small Business Act. See 15 U.S.C. §§ 631–657(f); see also 13 C.F.R. § 124.1.

U.S.C. § 1491(b)(1). This court employs the standards of the Administrative Procedure Act in considering such protests. 28 U.S.C. § 1491(b)(4). The Administrative Procedure Act authorizes the court to set aside actions by an agency that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

■ The term "interested party" is defined consistently with the definition of the same term in the Competition in Contracting Act of 1984, 31 U.S.C. § 3551(2)(A). *Am. Fed'n of Gov't Employees AFL–CIO v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001). Standing to bring a protest as an interested party under the Administrative Dispute Resolution Act is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract." *Banknote Corp. of Am. v. United States,* 365 F.3d 1345, 1352 (Fed.Cir. 2004) (quoting *Am. Fed'n of Gov't Employees,* 258 F.3d at 1302). We address the issue of prejudice before considering the merits of a bid protest. *Info. Tech. Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed. Cir.2003) (holding that a "question of prejudice goes directly to the question of standing, [therefore] the prejudice issue must be reached before addressing the merits.").

A losing bidder seeking to interfere with a government procurement must meet a high burden. *See, e.g., Banknote Corp.,* 365 F.3d at 1351; *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1058 (Fed.Cir. 2000) (noting that the "arbitrary and capricious standard ... is highly differential ... [and] requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."); *see also Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996) (ruling that a "protester must show not only a significant error in the procurement process, but also that the error prejudiced it.").

■ Plaintiff must establish that the procurement lacked a rational or reasonable basis and that the procurement involved a clear and prejudicial violation of applicable statutes and regulations to prevail in a bid protest. *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324,

1332–33 (Fed.Cir.2001); *Scanwell Labs., Inc. v. Shaffer,* 424 F.2d 859, (D.C.Cir.1970). So long as a rational basis exists, the agency decision will be upheld. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The contracting agency must judge offerors fairly, however, applying the same standards to each.

The trial court in *Alfa Laval Separation, Inc. v. United States* found that the Navy had imposed an unnecessarily strict testing procedure on equipment for which it had contracted. 40 Fed.Cl. 215, 230 (1998), *rev'd on other grounds,* 175 F.3d 1365 (Fed.Cir. 1999). Even though the Navy recognized that the procedure listed in the RFP was unnecessary, "the Navy [was] strictly bound by its terms ...." *Alfa Laval,* 40 Fed.Cl. at 230. The appeals court noted that "in waiving a portion of the standard for [the winning bidder], the Navy violated a clearly applicable procurement statute and regulation." *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999).

The Court of Appeals for the Federal Circuit ruled that the Navy was obligated to "evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation" *Alfa Laval,* 175 F.3d at 1367 (citing 10 U.S.C. § 2305(b)(1)). The contracting officer was required to "issue a written amendment to a solicitation when it 'changes, relaxes, increases, or otherwise modifies its requirements,' and to provide an opportunity for competitors to submit new or amended proposals when it prefers a proposal involving 'a departure from the stated requirements.'" *Id.* (citing 48 C.F.R. § 15.606(c)). Similar problems arose in the course of this procurement.

The Government relaxed or waived requirements of its solicitation and thereby enabled Strong Vessel to win the contract. This affected plaintiff's direct economic interest because otherwise it likely would have been the winning offeror. Plaintiff is an interested party within the meaning of section 1491(b)(1). *E.g., Alfa Laval,* 175 F.3d at 1367 (holding that a protester must show only "that there was a substantial chance it

would have received the contract award but for that error") (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir. 1996)); *see also Impresa Construzioni*, 238 F.3d at 1332 (holding "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) if the procurement procedure involved a violation of regulation or procedure"); *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574–75 (Fed.Cir.1983) (to show injury a party is only required to establish that but for the alleged error, "there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration") (quoting *Morgan Bus. Assocs. v. United States*, 223 Ct.Cl. 325, 619 F.2d 892, 896 (1980)).

## DISCUSSION

### A. Violation of Regulation or Procedure

■ A contractor awarded a small business set-aside contract for services must show that it will incur at least fifty percent of its labor costs on the contract from its own employees. Federal Acquisition Regulations require that contracting officers include FAR § 52.219–14, Limitations on Subcontracting, "in solicitations and contracts for supplies, services and construction, if any portion of the requirement is to be set aside for small business and the contract amount is expected to exceed $100,000." FAR § 19.508(e).

The Limitations on Subcontracting clause provides, "[b]y submission of an offer and execution of a contract, the Offeror/Contractor agrees that in performance of the contract . . . at least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern." FAR § 52.219–14(b)(1). The purpose of this provision is to insure that small business concerns do not pass along the benefits of their contracts to their subcontractors.[3] The solicitation contained boxes to be

checked by the contracting officer to show that such provisions are applicable to the contract. The contracting officer did not check this box on the solicitation, however.

Plaintiff contends that it does not matter whether the box was checked because the law requires that a small business contractor make this commitment. Congress established the rule that at least fifty percent of the cost of labor on an SBA contract must participate in the contract to qualify. Defendant argued initially that the contract provision did not apply because the box was not checked. It also claimed that plaintiff waived its right to raise the issue because plaintiff did not point out the problem before bid opening. The GAO accepted a similar argument in ruling against plaintiff's July 2005 protest. It found that plaintiff could not complain about "alleged improprieties in a solicitation which are apparent prior to bid opening."[4]

The timeliness rule is not binding on this court. In fact, it is not binding on GAO— FAR provides that "GAO, for good cause shown, or where it determines that a protest raises issues significant to the procurement system, may consider an untimely protest." 4 C.F.R. § 21.2(c). "A GAO rule that self-limits that agency's advisory role [cannot] constitute[ ] a limit . . . on this court's exercise of jurisdiction. [The Tucker Act] explicitly provides that this court shall have bid protest jurisdiction 'without regard to whether suit is instituted before or after the contract is awarded.'" *Software Testing Solutions Inc. v. United States*, 58 Fed.Cl. 533, 535 (2003); *see also Cubic Def. Sys., Inc. v. United States*, 45 Fed.Cl. 239, 252 (1999) (noting that "this court has followed GAO's timeliness rule when the plaintiff's protest is founded upon alleged defects in the solicitation," but not in the case of a procurement violation). The contracting officer also

---

3. "A [small business] concern may not be awarded a contract . . . as a small business concern unless the concern agrees that—[ ] in the case of a contract for services (except construction), at least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern . . . ." 15 U.S.C. § 644(o)(1)(A).

4. "Protests based upon alleged improprieties in a solicitation which are apparent prior to bid opening or the time set for receipt of initial proposals shall be filed prior to bid opening or the time set for receipt of initial proposals." 4 C.F.R. § 21.2(a)(1).

raised the application of the Christian Doctrine.

The Christian Doctrine provides that contract terms that should have been included in a given contract are considered to have been included, even if they were not. *See G.L. Christian & Assocs. v. United States,* 160 Ct.Cl. 1, 312 F.2d 418 (1963) (holding that government contracts must be read as if they included clauses required by law). Defendant argued initially that the Christian Doctrine does not apply to a solicitation, as in this case, but only to the contract itself. Plaintiff did not depend on the Christian Doctrine because it contended that fifty-percent labor participation is required by law for small business set-asides. It asserted, however, that defendant's argument made no sense because the solicitation was the Government's offer. Once accepted, it becomes a part of the contract.[5]

The contracting officer argued that plaintiff was responsible for noticing that the box next to the Limitation on Subcontracting provision was not checked. GAO agreed. TransAtlantic's protest is proper because it alleged that the contracting officer violated statutory and regulatory requirements. The contracting officer stated that he

> did not feel the 50 % rule was an issue. Had [TransAtlantic] raised the question of 52.219–14 during either the pre-proposal conference, discussions or under the Small Business Size challenge this issue would have been examined. [Plaintiff] infers that it is the Contracting Officer's responsibility to evaluate the compliance of 52.219–14. The clause actually states "[b]y submission of an offer and execution of a contract, the Offeror/Contractor agrees that in performance of the contract .…" Therefore, it is the responsibility of the offeror/contractor to ensure they are in compliance with the clause.

This may comport with GAO procedure, but we do not review alleged violations of statutes and regulations in this manner.

This court reviews compliance with procurement regulations, including FAR 52.219–14(b). *Chapman Law Firm v. United States,* 63 Fed.Cl. 519, 527 (2005) (noting that "a proposal that fails to conform to a material term and condition of the solicitation, such as the subcontracting limitation, is unacceptable and may not form the basis for an award."). One consideration is whether "a proposal, on its face, should lead an agency to the conclusion that an offeror could not and would not comply with the subcontracting limitation." *Id.* (quoting *Coffman Specialties, Inc.,* B–284546, B–284546.2, 2000 WL 572693, at *4 (Comp.Gen. May 10, 2000)).

Plaintiff did not show that Strong Vessel will *not* be in compliance with FAR 52.219–14, *according to defendant.* This argument offered additional support for concluding that the contracting officer could not or did not know whether Strong Vessel would comply with SBA regulations. The Government acknowledged that "the lack of information from Strong Vessel [regarding compliance with FAR 52.219–14] by itself presents a difficult (or impossible) challenge .…" Defendant stated during the hearing that Strong Vessel would comply, but did not explain except to suggest the possibility of a contract modification.

The agency in *Chapman Law Firm* was unable to determine from the face of the offeror's proposal whether it complied with the Limitation on Subcontracting clause. *Chapman Law Firm,* 63 Fed.Cl. at 528. The contracting officer contacted the bidder before award to ask how it would comply with FAR 52.219–14. *Id.* The agency followed up; it directed the offeror to address the division of responsibilities among its subcontractors until it was satisfied that the proposal complied with SBA regulations. That did not happen here.

Strong Vessel's bid in this case, like the initial proposal in *Chapman Law Firm,* did not comply with the Limitation on Subcontracting Clause. Strong Vessel proposed to subcontract most of the labor services needed to perform the contract, including the

---

**5.** Solicitations for government contracts are interpreted in the same manner as the contracts themselves; the same rules of construction apply. *See, e.g., Grumman Data Sys. v. Dalton,* 88 F.3d 990, 997–98 (Fed.Cir.1996) (interpreting a solicitation using contract interpretation rules).

boat and its crew.[6] The record shows that the crews necessary for performance of this contract include port agents, stevedores, and truck drivers—all of whom would be subcontract labor. The crews are on duty twenty-four hours a day, seven days a week according to an affidavit offered by TransAtlantic, requiring at least two crews. Strong Vessel's proposal includes the following technical capability narrative:

[REDACTED INFORMATION]

The contracting officer now states that the excess subcontracted labor is offset by Strong Vessel's listing of nine front-office managers included in a section of the contractor's proposal called "Management Ability and Procedures." The nine officers include Strong Vessel's president, its treasurer, its secretary, its accountant, and various line managers.

Laws and regulations applicable to small business set-asides measure compliance with the Limitation on Subcontracting clause by the cost of the labor rather than the number of employees. *See* 15 U.S.C. § 644(*o*); 13 C.F.R. § 125.6(a). "To determine compliance with the 50 percent rule, the contractor's labor costs are compared with the total labor costs associated with the performance of the contract." *B & M Cleaning Servs.*, 1995 WL 253525 (S.B.A.), SBA No. 4017 (1995) at n. 1.

The bid proposal stated that three of the managers—the president, the secretary, and the commercial manager—are to "be kept informed of the developments and operating procedures of the service. If the Line Manager or Assistant Line Manager are unavail-

able for any reason one of these individuals can and will take action to insure customer satisfaction." This sounds as though only two front-office managers have direct responsibility for this contract. The Record does not contain information regarding the salaries of management personnel related to the contract, or the amount of time that they are expected to devote to it.

Management personnel listed in the proposal may spend time on this contract as indicated, but their duties would not be substantial. Only marginal indirect costs in the form of management services would be provided by front-office personnel. The incumbent contractor currently has two managers assigned to the project. The contracting officer did not have a reasonable basis for determining that Strong Vessel could meet the Limitation on Subcontracting clause, if he inquired at all.[7]

### B. Self–Sustaining Refrigerated Cargo Containers

The other substantive issue in this case is the solicitation requirement that the winning offeror provide refrigerated cargo containers that will insure the safety of perishable goods during transit. The solicitation required that offerors provide self-sustaining refrigerated containers.[8] The refrigeration equipment was to include a generator that would permit the system to be self-sustaining aboard ship, so that the goods would survive if the barge lost power at sea. The parties agree that only a unit with a "clip-on" generator accompanying it would be self-sustaining.

Self-sustaining refrigerated containers are a material element of the contract and a

---

6. The Record includes a declaration from the vice-president of TransAtlantic stating that the cost of owning a tug boat and employing its crew, instead of chartering one, exceeds $[REDACTED INFORMATION] per year. The Government argued at the hearing that Strong Vessel did not say that it intended to time-charter its boat. The contracting officer conceded that time-chartering was a part of Strong Vessel's proposal, however.

7. Various news articles and awards included in Strong Vessel's revised proposal suggest that the company is actively managing other contracts in scattered parts of the world. This court does not question Strong Vessel's capability, its expertise,

or its business reputation, all of which seem impressive from a review of the Record. However, the issue is whether the contracting officer should have seen that the nine front-office managers would not be focused on performance of this contract alone.

8. "Self-sustaining" is defined in the solicitation as "[a] refrigerated container which does not need an external power or fuel source, and upon which a self-contained power unit is mounted, either on the container or its accompanying chassis. The container is self-sustained only while the power unit and its fuel source are mounted."

basis for technical evaluation of the bids. The two types of generators are "clip-on" and "underslung." Clip-on generators are attached to refrigerated containers and contain their own fuel, thereby making the refrigerated containers self-sustaining. Underslung generators are attached to a truck's flatbed or chassis during transportation of refrigerated containers on land. Once a refrigerated container powered by an underslung generator set is unloaded from a truck and placed on the barge, it no longer has an independent power source, and is not self-sustaining.

The solicitation requirement for self-sustaining refrigerated containers calls for the use of clip-on generators. Underslung generators do not meet the solicitation requirement because they do not remain attached to the refrigerated container throughout contract performance. Underslung generators are used when the refrigerated containers are being transported on land.

The contracting officer decided with help from his technical board that Strong Vessel's proposed refrigeration unit would be self-sustaining—from looking at a picture. He stated, "[o]ne picture is worth a thousand words." He thought both Strong Vessel and TransAtlantic had proposed clip-on generators. This was not the case, however. The picture in question did not show that Strong Vessel used clip-on generators that permit refrigeration units to be self-sustaining on board ship. The contracting officer should have understood that Strong Vessel intended to use noncompliant underslung generators because its discussion of generator sets related to the leasing of flat-racks that are used on trucks, not barges.[9]

Defendant acknowledged that the contracting officer misinterpreted Strong Vessel's picture. It argued nevertheless that the court's review is limited to deciding whether the contracting officer's procedure

for qualifying the generators was reasonable, irrespective of whether it was correct or successful. The contracting officer asked his technical panel about the picture. Questions must have arisen regarding whether the equipment was suitable. A panel member stated that the photograph "alighted my concerns," and the others agreed. The misinterpreted photograph was the basis for the contracting officer's approval of this key technical requirement.

Strong Vessel evidently knew that it was not submitting a generator that would operate the refrigeration system during a power failure on board. The solicitation required that offerors submit a contingency plan for loss of power at sea. The obvious back-up plan for such a failure would be, "turn on the generators." Instead, Strong Vessel's contingency plan for power failure was to "[h]ave the vessel make a repair underway if possible; [h]ave the vessel seek a port of refuge to get assistance ...; or [h]ave the vessel arrive early to [Guantanamo]."[10] The Plan makes no mention of the solution required by the solicitation: Activate the clip-on generators.

Strong Vessel's counsel did not know why the contingency plan did not include switching to the auxiliary generators. The contracting officer's explanation was that the Government did not evaluate contingency plans on this contract because its importance was only "to impress on the offeror ... the seriousness [of] maintaining the sailing as scheduled." This misses the point, however. A review of the contingency plan would have shown the contracting team that its choice of contractor for the job did not intend to provide a means of protecting perishable goods at sea, as required by the solicitation and the contract.

### INJUNCTIVE RELIEF

The Tucker Act Amendments authorize us to "award any relief that the court considers

---

9. GAO rejected plaintiff's protest in part because *the Request for Proposals did not contain "detailed design specifications for the containers, or details of how an offeror should propose to meet the self-sustaining aspect of the requirement."* Whether the RFP contained a design for the refrigeration unit seems entirely irrelevant. The parties agree that only one type of generator

complies, and the winning bidder did not provide it.

10. By contrast, plaintiff's contingency plan states "we have clip-on [generators] on the [refrigerated containers], which could be utilized in the event that both generators should fail for some reason."

proper, including ... injunctive relief." 28 U.S.C. § 1491(b)(2). "Injunctive relief is an extraordinary remedy," however. *E.g., Dynacs Eng'g Co. v. United States,* 48 Fed.Cl. 614, 616 (2001) (a "party moving for an injunction bears a heavy burden to demonstrate that such relief is warranted.") (citing *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993)); *see also Durable Metals Prods., Inc. v. United States,* 27 Fed.Cl. 472, 476, *aff'd,* 11 F.3d 1071 (Fed.Cir.1993) (table).

■ To obtain injunctive relief in a bid protest the petitioner must show: (1) a reasonable likelihood of success on the merits; (2) that it will suffer irreparable harm if injunctive relief is not granted; (3) that the harm it would suffer outweighs harm to the Government and to third parties; and (4) that granting the injunction serves the public interest. *See, e.g., United Int'l Investigative Servs., Inc. v. United States,* 41 Fed.Cl. 312, 323 (1998).

## A. Success on the Merits

■ A protester must demonstrate that but for the alleged error, "there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration." *CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1574–75 (Fed.Cir. 1983). Plaintiff submitted the second-lowest bid and its technical proposal was superior to Strong Vessel's. We do not have detailed information about the relative costs of complying with technical requirements of the solicitation and the costs of complying with applicable Small Business Act regulations. The parties did not argue this issue substantively.[11]

Price differential in bids is only one factor for a court to consider in this area. *See Alfa Laval,* 175 F.3d at 1368 (rejecting the trial court's denial of relief based in part on the

"colossal price difference" between the two top bidders). The Federal Circuit noted, "while price differential may be taken into account, it is not solely dispositive; we must consider all the surrounding circumstances in determining whether there was a substantial chance that a protester would have received an award but for a significant error in the procurement process.". *Id.*

We issued an Order advising the parties "for planning purposes" that the court would enjoin award of the contract in dispute until we can meet with counsel to discuss means of resolving the problems discussed above. *TransAtlantic Lines, LLC v. United States of America,* No. 05–866C (Fed.Cl. Sept.6, 2005).

The Order added,

[t]he issues are whether the contracting officer reasonably determined from a photograph that the intervenor's refrigerated cargo containers would be self-sustaining; and whether the Army ignored legal requirements the contract be performed by at least fifty percent of the contractor's own employees. The contracting officer did not reasonably rely on the photograph in question; and the Government did not follow applicable SBA statutes and regulations.

*Id.* We made additional findings in the Order that plaintiff "would suffer irreparable harm if the court does not act, the harm resulting from failure to act would outweigh any harm to the Government, and the public interest is served by this action." *Id.* Plaintiff succeeded on the merits.

## B. Irreparable Harm

This court considers whether a petitioner has an adequate remedy at law when deciding irreparable harm.[12] *See, e.g., Overstreet*

---

**11.** TransAtlantic's vice president filed a declaration stating that costs of supplying the clip-on generators required by the solicitation and the fuel to power them is approximately $[REDACTED INFORMATION] per year for each container. We have no other evidence on this issue. Defendant responded only that this estimate "could be wrong." The vice president also asserted that owning the barge and operating it with the company's own employees cost more than $[REDACTED INFORMATION] per year.

**12.** At least one court has ruled that a finding of likely success on the merits creates a presumption of irreparable harm. *See CW Gov't Travel, Inc. v. United States,* 61 Fed.Cl. 559, 577 (2004) (holding that "[a] movant that clearly establishes likelihood of success on the merits receives the benefit of a presumption of irreparable harm.")(quoting *Reebok Int'l Ltd. v. J. Baker, Inc.,* 32 F.3d 1552 (Fed.Cir.1994)). *Reebok* was a patent infringement case.

*Elec. Co. v. United States,* 47 Fed.Cl. 728, 743–44 (2000) ("[T]he relevant inquiry in weighing [irreparable harm] is whether plaintiff has an adequate remedy in the absence of an injunction.") (quoting *Magellan Corp. v. United States,* 27 Fed.Cl. 446, 447 (1993)). "[T]he potential loss of a valuable business on [a] contract ... has been found sufficient to prove irreparable harm." *Overstreet Elec.,* 47 Fed.Cl. at 744; *see also Red River Serv. Corp. v. United States,* 60 Fed. Cl. 532, 549 (2004) (loss of an opportunity to compete fairly for a contract may constitute "significant harm") (citing *United Int'l Investigative Servs., Inc. v. United States,* 41 Fed. Cl. 312, 323 (1998)).

### C. The Balance of Hardships

Balancing the parties' hardships requires consideration of the harm that injunctive relief would impose on the Government. *E.g., Overstreet,* 47 Fed.Cl. at 744. The Government often argues hardship from the impact of delay in the procurement process, for example. "However, 'only in an exceptional case would [such delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests.'" *Id.* (quoting *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 399 (1999)). No reason has appeared in this case to suggest concern about delay in the procurement process. Plaintiff is the incumbent contractor and presumably it can continue operations if necessary until the parties can meet with the court to discuss further proceedings.

This court considers national security concerns where contracts involving military operations are implicated, irrespective of whether the parties raise the issue. "In exercising jurisdiction [over procurement cases], the courts shall give due regard to the interests of national defense and national security ...." 28 U.S.C. § 1491(b)(3). We have reviewed the Administrative Record carefully and found no basis for speculating that this Order will affect the national security interests of the United States. Defendant did not argue that potential delays would create such problems, and none is apparent. The balance of hardships tips in plaintiff's favor.

### D. The Public Interest

The public has a strong interest in insuring that public officials treat contractors fairly and generally obey procurement laws and regulations. *See, e.g., CW Gov't Travel, Inc. v. United States,* 61 Fed.Cl. 559, 578 (2004) (describing "an overriding public interest in preserving the integrity of the federal procurement process by requiring Government officials to follow procurement statutes and regulations.") (citing *United Int'l Investigative Servs., Inc.,* 41 Fed.Cl. at 323); *see also Alfa Laval,* 40 Fed.Cl. at 235 ("the public has a strong interest in assuring that the integrity of the procurement laws are preserved—both in letter and spirit.") (citing *Parcel 49C Ltd. P'ship v. United States,* 31 F.3d 1147 (Fed.Cir.1994)). "Allowing the Government to deviate from mandatory specifications does not comport with this goal." *Id.*

## CONCLUSION

The contracting officer's apparent willingness to relax contract requirements for the winning offeror was "a significant, prejudicial error in the procurement process." *Chapman Law Firm,* 63 Fed.Cl. at 529 (citing *Alfa Laval,* 175 F.3d at 1367).

TransAtlantic's proposal was technically superior to Strong Vessel's, yet the contracting officer gave Strong Vessel a competitive advantage over TransAtlantic. Strong Vessel did not propose the clip-on generators that must be used to guarantee that the refrigeration units would be self-sustaining. Strong Vessel's contingency plan shows that it knew the system it proposed would not provide such protection. The Government argued that contracting officer and his technical panel were satisfied by the photograph showing what they thought was a compliant refrigeration system, apparently taking the position that this should be sufficient. But the panel gave the contracting officer—an acknowledged "non-technical person"—bad advice. The contracting officer should have contacted the offerors if he was uncertain about the bid proposals.

Strong Vessel did not comply with statutes and regulations requiring that half of its labor costs be attributable to its own personnel. It would subcontract most of the labor

necessary to perform this contract. The Government contends now that Strong Vessel will comply with both the technical requirements and the SBA regulations, but it has not explained how. Defendant's counsel asserted at the hearing that the Agency has or will have obtained a "contract modification" to insure Strong Vessel's compliance with the solicitation. This would require Strong Vessel to take additional, costly steps to comply with the solicitation after having received the contract award, without additional consideration.

Plaintiff's petition for injunctive relief is GRANTED. The Government may not permit performance by intervenor Strong Vessel Operators, LLC pursuant to the contract at issue in this case. Defendant's motion for summary judgment on the Administrative Record is DENIED.