**CHAPMAN LAW FIRM, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Harrington, Moran, Barksdale, Inc., Defendant–Intervenor.**

No. 04–1681 C.

United States Court of Federal Claims.

Jan. 25, 2005 [1].

---

1. This opinion and order was issued under seal on January 4, 2005. Pursuant to the second paragraph of the ordering language in the January 4, 2005 opinion and order, the parties were instructed to identify protected/privileged material subject to deletion. Only defendant proposed redactions. Brackets identify where material has been deleted.

James S. DelSordo, Washington, DC, for plaintiff.

Andrew P. Averbach, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Brian M. Simkin, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. Carolyn P. Fiume, United States Department of Housing and Urban Development, Washington, DC, of counsel. James C. Cantlon and David A. Fishman, Small Business Administration, Washington, DC, of counsel.

Alexander J. Brittin, Washington, DC, for defendant-intervenor.

*OPINION AND ORDER*

HEWITT, Judge.

Before the court is the post-award bid protest of Chapman Law Firm Company, LPA (Chapman). Chapman alleges that the Department of Housing and Urban Development (HUD) breached the implied contract of fair dealing in connection with this procurement and awarded the contract to Harrington, Moran Barksdale, Inc. (HMBI) in violation of the terms of the Request for Proposals. Complaint (Compl.) at 1. Chapman seeks injunctive and declaratory relief pursuant to 28 U.S.C. § 1491(b)(1) and Rule 65 of the Court of Federal Claims and legal relief under 28 U.S.C. § 1491(a)(1). *Id.* For the following reasons, plaintiff's protest is DISMISSED.

I. Background

On August 6, 2003, HUD issued a solicitation for the Management and Marketing of Single Family Homes under Request for Proposals Number R–OPC–22505 (Solicitation) seeking proposals for the provision of

> Management and Marketing services to successfully monitor mortgagee compliance with the Department's property conveyance requirements, to successfully manage single family properties owned by, or in the custody of, the Department of Housing and Urban Development (HUD), to successfully market those single family properties which are owned by HUD, and to successfully oversee the sales closing activity, including proper accounting for HUD's sales proceeds.

Compl. ¶ 8; Administrative Record (AR) at 24 (Solicitation). The Solicitation sought contractors to perform management and marketing services for various geographical regions around the United States. AR at 25 (Solicitation). The Solicitation provided for the award of multiple indefinite quantity indefinite delivery fixed-unit-rate contracts with full and open competition for some contracts, with a small business set-aside for other contracts, and with a section 8(a) set-aside for still other contracts.[2] *Id.* at 24–26,

---

**2.** A business concern is determined to be a small business if it meets the size criteria addressed in section 632 of the Small Business Act, as amended in 1997, 15 U.S.C. §§ 631–657f (1997). *See*

274. The Solicitation stated that HUD "intend[ed] to award up to twenty-four (24) contracts without discussions and to those Offerors whose proposals represented the best overall value to the Government." *Id.* at 274. HUD "reserve[d] the right to hold discussions with all Offerors determined to be in the Competitive Range." *Id.*

The Solicitation contemplated one contract award for each geographical region within a designated Home Ownership Center (HOC). *See id.* at 25–26, 39. The Solicitation identifies four HOCs covering four geographical regions: Atlanta HOC, Denver HOC, Philadelphia HOC, and Santa Ana HOC. *Id.* at 25–26. Each HOC is comprised of five to seven areas that cover entire states or designated counties within larger states. *Id.* (Solicitation); *see also id.* at 25; Plaintiff's Statement of Facts in Support of Its Motion for Judgment on the Administrative Record (Pl.'s SOF) ¶ 4. In this protest, Chapman challenges the contract award for the portion of the contract providing management and marketing services in the states of Illinois and Indiana (the Illinois–Indiana contract), which is Area I of the Atlanta HOC. Compl. ¶ 13; AR at 25 (Solicitation).

The Solicitation, AR at 269, required offerors to submit proposals in two parts: Part I-Technical and Management Proposal, *id.* at 270–73, and Part II—Business Proposal, *id.* at 273–74. The Solicitation stated that the technical evaluation factors "shall be considered significantly more important than price." *Id.* at 280. The Solicitation identified six evaluation criteria for the technical proposal in descending order of importance: (1) Management Capability and Quality of Proposed Management Plan, (2) Past Performance, (3) Prior Experience, (4) Proposed Key Personnel, (5) Subcontract Management, and (6) Small Business Subcontracting Participation. *Id.* at 280–82. The Solicitation stated that total evaluated price of the business proposal would be "traded off" against

the technical portion of the proposal "to determine the overall best value to the Government." *Id.* at 283.

The Solicitation provided that the award for the Illinois–Indiana contract would be made to an eligible small (non–8(a)) business if adequate competition existed among the small businesses, and, absent adequate competition, then by cascading priority to an unrestricted business entity. *Id.* at 25, 285. The record indicates that HUD determined that the competition among small businesses was adequate. *See* AR at 906, 908, 921 (initial evaluation report by the Technical Evaluation Panel (TEP) for Illinois–Indiana contract). HUD also determined that the proposal submitted by Chapman was "within the competitive range" for the contract award. *Id.* at 970 (letter from HUD to Chapman dated 4/2/04 initiating written discussions). HUD determined that the proposal submitted by HMBI was "within the competitive range" for the contract award. *Id.* at 980 (letter from HUD to HMBI dated 4/2/04 initiating written discussions).

On July 7, 2004, the contracting officer issued a pre-award notice to Chapman advising of HUD's intent to award the Illinois–Indiana contract to HMBI, the defendant-intervenor in this action. *See id.* at 1745 (HUD's pre-award notice of intent dated 7/7/04). The next day, on July 8, 2004, Chapman filed an unsuccessful size protest with the Small Business Administration (SBA) challenging HMBI's eligibility for award. *See generally id.* at 1749–95 (Chapman's SBA size protest filed 7/8/04); *see also Chapman Law Firm v. United States*, 63 Fed.Cl. 25, 26 & n. 1 (2004) (*Chapman II*) (discussing Chapman's SBA size protest).

On July 30, 2004, HUD awarded the Illinois–Indiana contract to HMBI. AR at 345–509 (HUD's contract award to HMBI dated 7/30/04). On November 18, 2004, Chapman filed this action.[3] Compl. at 1. Chapman

---

15 U.S.C. § 632 (2000). A section 8(a) small business concern is one that is "owned and controlled by socially and economically disadvantaged individuals," 15 U.S.C. § 637(a)(1)(C), and has completed participation in the business development program authorized by the Small Business "to assist eligible small disadvantaged

business concerns compete in the American economy," 13 C.F.R. § 124.1 (2004). *See also* 15 U.S.C. § 636(j).

**3.** In addition to its SBA size protest, Chapman also filed an unsuccessful protest with the Government Accountability Office (GAO) challenging

complains that HUD acted arbitrarily and capriciously in awarding the Illinois–Indiana contract to HMBI, *id.* ¶¶ 29–34, that it is entitled to injunctive relief, *id.* ¶¶ 35–39, that HUD effected an out of scope modification of the contract terms and an improper amendment of the RFP, *id.* ¶¶ 40–44, and that HUD violated its implied duty of good faith and dealing, *id.* at ¶¶ 45–48. Chapman asks the court to enjoin HUD from permitting performance of the contract awarded to HMBI under the Solicitation and to award Chapman its reasonable costs, attorneys' fees and such further relief as is determined just and fair. *Id.* at 12.

The parties have filed cross-motions for judgment on the administrative record. *See* Plaintiff's Brief in Support of Judgment on the Administrative Record (Pl.'s Br.), Defendant's Motion for Judgment Upon the Administrative Record (Def.'s Mot.), Intervenor–Defendant's Rule 56.1 Motion for Summary Judgment (HMBI's Mot.), and the responsive briefing thereto.[4] The court heard oral argument on December 20, 2004.

## II. Discussion

### A. Standard of Review

Plaintiff alleges jurisdiction under the Tucker Act. Compl. ¶ 6. The Tucker Act, as amended by the Administrative Disputes Resolution Act (ADRA), 28 U.S.C. § 1491(b) (2000), confers jurisdiction on this court

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals

for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1).

The court reviews a bid protest action under the standard set forth in the Administrative Procedure Act (APA), 5 U.S.C. § 706 (2000). *NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1159 (Fed.Cir.2004). The APA provides that an agency's decision is to be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000). *See Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1329 (Fed.Cir. 2004) (same); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001) *(Impresa)* (same); *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057 (Fed.Cir.2000) (same). "[T]he court implements this APA standard by applying the standard as previously interpreted by the district court[ ] in … *Scanwell [Labs., Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970)]."[5] *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1351 (Fed.Cir.2004).

The Federal Circuit has stated that, under the APA standard applied in *Scanwell,* and now under the ADRA, " 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.' " *Id.* (quoting *Impresa,* 238 F.3d at 1332). When chal-

---

various aspects of this procurement, *see Chapman II,* 63 Fed.Cl. at 28 n. 3 (referencing GAO protest), and a successful action in this court challenging HUD's override of the stay mandated by the Competition in Contracting Act, 31 U.S.C. § 3553(d)(3)(A) (2000) during the GAO protest, *see Chapman Law Firm v. United States,* 62 Fed. Cl. 464, 469 (2004) *(Chapman I)* (in which this court ordered that contract performance be stayed pending adjudication of the protest before the GAO).

**4.** The responsive briefing includes: Plaintiff's Opposition to Defendant's and Intervenor's Motions for Judgment on the Administrative Record (Pl.'s Opp.); Defendant's Opposition to Plaintiff's Motion for Judgment Upon the Administrative Record (Def.'s Opp.); Intervenor–

Defendant's Opposition to Plaintiff's Motion for Judgment on the Record (HMBI's Opp.); Plaintiff's Reply in Support of Its Motion for Judgment on the Administrative Record (Pl.'s Reply); Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Judgment Upon the Administrative Record (Def.'s Reply); Intervenor–Defendant's Reply Brief (HMBI's Reply); Sur-Reply to Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Judgment Upon the Administrative Record (Def.'s Sur–Reply); Intervenor–Defendant's Sur–Reply Brief (HMBI's Sur–Reply); and Plaintiff's Response to Intervenor's Supplemental Filing (Pl.'s Supp.).

**5.** In *Scanwell,* the circuit court upheld the district court's review of government procurement decisions under the APA. *See* 424 F.2d at 874–75.

lenging a procurement on the ground of a regulatory violation, the protester "must show a clear and prejudicial violation of [the] applicable statutes or regulations." *Id.* (quoting *Impresa,* 238 F.3d at 1333). The protester must also "show that there was a 'substantial chance' [that] it would have received the contract award absent the alleged error." *Id.* (quoting *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1086 (Fed.Cir.2001)).

Here, as articulated in its motion for judgment on the administrative record, Chapman bases its claims for relief (Compl. at 12) on three principal grounds: (1) HMBI's violation of the Solicitation's limitation on subcontracting, Pl.'s Br. at 6–7, 15–16, (2) HUD's relaxation of the bonding requirement under the Solicitation, *id.* at 8–9, 16–17, and (3) HUD's failure to conduct meaningful discussions with Chapman, *id.* at 9–13, 19–20.[6]

Standing to bring a protest as an "interested party" under the ADRA, Compl. ¶ 7, is "'limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract.'" *Banknote Corp.,* 365 F.3d at 1352 (quoting *Am. Fed'n of Gov't Employees, AFL–CIO v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001)). As an offeror whose proposal was determined to be in the competitive range for the challenged award and whose direct economic interest was affected by the contract award to HMBI, Chapman has standing to bring this action as an interested party. *See Chapman II,* 63 Fed.Cl. at 29 (same).

The court now addresses the claims Chapman raised in its briefing.

**B. The Limitation on Subcontracting**

 The Solicitation requires a small business contractor to agree "[t]o adhere to the requirements of FAR § 52.219–14, Limitations on Subcontracting."[7] AR at 159 (FAR 52.219–17 Section 8(a) Direct Award (Deviation) (Nov 2001) Clause). FAR § 52.219–14

---

6. Chapman appears to have abandoned its argument that HUD failed to make a best value determination in this case. *Compare* Compl. ¶¶ 23–25 *with* Pl.'s Br. at 6–20. Chapman alleged in its complaint that the contracting officer's decision to award the Illinois–Indiana contract to HMBI, the higher technically-rated and higher-priced offeror, was inconsistent with the decision, made by the same contracting officer, not to award the [ ] contract, one of the other contracts awarded under the Solicitation, to the technically superior offeror because the price differential between the technically superior offeror and the successful offeror was not sufficient to justify the trade-off required in that case. *See* Compl. ¶¶ 23–25; Transcript of Status Conference dated November 18, 2004 (11/18/04 Tr.) at 8:17–14:21, 22:16–23:17. Although the same contracting officer made the award decisions for both the [ ] contract and the Illinois–Indiana contract, the two cases are distinguishable. The awardee of the [ ] contract submitted a proposal which had received a good technical rating and was priced at approximately $30 million dollars less than the technically superior proposal that the contracting officer declined to select for contract award. *See* 11/18/04 Tr. at 1:13–14:7. Here, however, HMBI, the contract awardee, submitted a proposal that received a good technical rating and was priced at approximately $29 million dollars more than the proposal submitted by Chapman which received a fair technical rating. *Id.* at 8:17–10:15. During the November 18, 2004 telephonic status conference with the parties, the court stated that, "to make an analogy that is robust between [the][ ] procurement and the [Illi-

nois–Indiana contract] procurement, the [c]ourt would need to know as much about the [ ] procurement as it knows about [the Illinois–Indiana contract] procurement." *Id.* at 22:21–25. The court observed that:

> [because] the award [of the [ ] contract] . . . was based on the differential between [e]xcellent and [g]ood . . . and the [g]ood got the award, it strikes [the court] that the closeness of the effort to get into a procurement which is not our procurement to provide guidance is not appropriately undertaken here and that the rationality or not of the decision not to award the Chapman Law Firm needs to stand or fall on the world within the [Illinois–Indiana contract] procurement, notwithstanding that there's the same [contracting officer].

*Id.* at 23:6–15. Because "the parties who are in a position to explain the [ ] procurement are not in front of the [c]ourt," the court refused Chapman's request to include in the AR evidence of the contracting officer's rationale for the award of the [ ] contract. *Id.* at 22:25–24:2. Chapman has not moved to amend or expand the AR to include documents relating to the [ ] contract or offered briefing supporting its right to such an amendment or expansion of the AR.

7. The Solicitation states that this particular clause applies only in those geographical "areas that are 8(a) set-aside or 8(a) Cascaded, and an 8(a) Offeror is consider[ed] for award." AR at 158 (FAR [§ ] 52.219–17 Section 8(a) Direct Award (Deviation) (Nov 2001) Clause).

states: "[B]y [the] submission of an offer and execution of a [services other than construction] contract, the Offeror/Contractor agrees that in performance of the contract ... [a]t least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern." FAR § 52.219–14(b)(1).

Chapman argues that the repeated references in HMBI's proposal to HMBI's subcontractor Best Assets as a key component in the anticipated performance of the HUD contract evidence an " 'almost exclusive[ ]' " reliance on Best Assets. Pl.'s Br. at 6 (quoting AR at 983 (TEP's initial evaluation report). Chapman asserts that HMBI's application to SBA seeking approval of its mentor-protégé relationship with Best Assets, see AR at 1427, 1439 (HMBI's response of 6/9/04 to reopened written discussion questions), provides no exemption from the limitation on subcontracting requirement under FAR § 52.219–14. Pl.'s Opp. at 3 (citing Enola–Caddell JV, B–292387.2, B–292387.4, 2003 WL 22251177, at *3 (Comp.Gen. Sept.12, 2003)) (stating that "the 8(a) mentor-protégé program provides participants with an exemption from affiliation for size purposes, but does not provide an exemption from the HUBZone requirements concerning joint ventures.") (footnote omitted)). Chapman states that HMBI's participation in the mentor-protégé program could not have formed a rational basis for HUD's decision to ignore its concerns about the relationship between HMBI and Best Assets because HMBI did not present the mentor-protégé documentation requested by HUD until October 25, 2004, nearly three months after the award of the contract. Id. (citing AR at 2521–29 (documentation showing SBA's approval of the mentor-protégé relationship between HMBI and Best Assets)).

Chapman argues that, because HMBI's proposal was so unclear regarding "[t]he division of responsibility between HMBI and Best Assets," see AR at 925, the TEP "could not determine" if HMBI complied with FAR § 52.219–14. Pl.'s Br. at 6; see also AR at 925 (TEP's initial evaluation report for Illinois–Indiana contract). Pointing to the description of the key personnel in HMBI's proposal, Chapman complains that the resumes of the proposed personnel responsible for contract performance oddly provided no specific information about their current or past employers. See Pl.'s Reply at 4 (citing AR at 799–837 (resumes of HMBI's key personnel contained in HMBI's initial proposal dated 9/4/03)). Rather, the resumes of HMBI's key personnel "list[ed] job titles, position outlines and general descriptions of their employer(s)." Id. Chapman asserts that a review of the resumes of HMBI's key personnel and the commitment letters submitted by HMBI's key personnel indicates that both the contract manager and the alternate contract manager for the Illinois–Indiana contract are Best Assets employees. Id. (citing AR at 1213–14 (commitment letters of Messrs. James Casey and Frank Cassar included in HMBI's final proposal revision dated 6/8/04)). Based on the organizational chart contained in HMBI's initial proposal dated September 4, 2003, see AR at 724, and the description of the contract manager's duties contained in HMBI's final proposal revision dated June 8, 2004, see AR at 1513, Chapman argues that a Best Assets employee rather than an HMBI employee would be "totally responsible," as contract manager, for "the entirety of contract performance" under the Illinois–Indiana contract, including "acquisition, management, marketing and closing of properties." Pl.'s Reply Br. at 4; but compare AR at 724(organizational chart contained in HMBI's initial proposal dated 9/4/03) with id. at 1513 (description of the contract manager's duties contained in HMBI's final proposal revision dated 6/8/04). Chapman adds that "HMBI's total contract performance [would be] depend[e]nt upon its use of Best Asset's electronic database ... and Best Asset's property maintenance scheduling application." Pl.'s Reply Br. at 4–5 (citing AR at 742 (description of computerized database system to be used by HMBI contained in initial proposal dated 9/4/03)). Contending that HUD could not determine HMBI's compliance with FAR § 52.219–14 from either HMBI's proposal or its responses to discussion questions, Chapman urges that "HMBI's proposal should have been disqualified." Pl.'s Br. at 15.

Defendant argues that "nothing *on the face of HMBI's proposal* ... demonstrates that HMBI will not comply with th[e] limitation [on subcontracting]." Def.'s Mot. at 13. Defendant states that, "[c]onsistent with FAR § 52.219–14, HMBI originally estimated that subcontractors would perform 50% of the work required." *Id.* (citing AR at 855 (subcontract management plan outlined in HMBI's initial proposal dated 9/4/03)). Defendant points out that, in response to HUD's inquiries regarding this issue during the first discussion phase, *id.* (citing AR at 981, 983 (HUD's discussion letter to HMBI dated 4/2/04)), HMBI "represented in its Final Proposal Revision of April 8, 2004 that it 'believe[d] that the total subcontract dollars will be less than 50 percent' and set forth the basis for th[at] belief," *id.* (citing AR at 1167 (HMBI's responses to discussion questions and final proposal revision dated 4/8/04)). Defendant contends that although "a [particular] subcontractor was prominently mentioned in HMBI's proposal[,] ... [t]he mere mention of subcontractors hardly suggests (let alone facially demonstrates) that the contract has in any way been modified to accommodate the amount of work performed by HMBI's subcontractors." Def.'s Mot. at 13–14.

HMBI argues that, in an earlier bid protest, GAO expressly considered and rejected Chapman's argument that HMBI's proposal, on its face, violated the limitation on subcontracting requirement. HMBI's Mot. at 14. HMBI asserts that Chapman's argument failed because "HMBI's proposal, on its face, clearly explain[ed] how it [would] comply with the limitation on subcontracting." *Id.* HMBI contends that, during discussions, it "explained the division of responsibility and clarified its responsibilities and Best Assets' responsibilities" to the satisfaction of the TEP. HMBI's Opp. at 4 (citing AR at 1223, 1630 (HMBI's responses to discussion questions and final proposal revision dated 4/8/04 and final TEP report)). HMBI points out that its response to HUD's discussion question about its compliance with the limitation on subcontracting requirement was similar to Chapman's own response to HUD's discussion question about Chapman's compliance with the limitation on subcontracting requirement.[8] HMBI's Reply at 2–3.

HMBI also argues that Chapman has "mischaracterize[d] Best Assets' role as HMBI's subcontractor." HMBI's Reply at 4. In support of its claim that "Best Assets is performing the entirety of the marketing and management effort relating to the 7000 properties in [the Illinois–Indiana contract]," Pl.'s Opp. at 4, Chapman relies on the work flow chart showing HMBI's environmental compliance strategy to address the issues of lead assessment, inspection, stabilization and clearances. *See* AR at 758 (HMBI's environmental compliance strategy work flow chart contained in HMBI's initial proposal dated 9/4/03). HMBI explains that it provided the workflow chart solely in response to HUD's discussion question concerning HMBI's environmental compliance strategy, HMBI's Reply at 4; AR at 757–58 (HMBI's environmental compliance strategy and accompanying work flow chart contained in HMBI's initial proposal dated 9/4/03), and asserts that "a simple reading" of the language in its proposal preceding the workflow chart indicates that "[t]he workflow chart does not represent what Chapman claims regarding Best Assets' role as HMBI's subcontractor." HMBI Re-

8. HMBI responded to HUD's discussion question about its compliance with the limitation on subcontracting requirement stating:

> HMBI plans to employ at least 50% of its personnel. HMBI Management Team will review total costs incurred on personnel quarterly to ensure that our employees are performing at least 50% of the costs expended.

AR at 1223 (HMBI's response to HUD's written negotiations dated 4/8/04).

Although Chapman failed to respond to HUD's April 2, 2004 discussion letter asking about Chapman's compliance with the limitation on subcontracting, *see* AR at 976 (HUD's discussion letter to Chapman dated 4/2/04), AR at 988–1133 (Chapman's response to HUD's discussion questions dated 4/8/04), Chapman did respond to HUD's discussion question on the issue repeated in HUD's discussion letter to Chapman dated April 27, 2004, *see* AR at 1233 (HUD's discussion letter to Chapman dated 4/27/04), stating:

> We have reviewed FAR 52.219–14, Limitations on Subcontracting, and pursuant to this regulation have reduced our subcontracting goal to forty-five (45%) in order to attain full compliance.

AR at 1254–55 (Chapman's responses dated 5/3/04 to HUD's discussion questions).

ply at 4 (citing AR at 757 (HMBI's environmental compliance strategy work flow chart contained in HMBI's initial proposal dated 9/4/03)). In particular, HMBI points out that the environmental compliance strategy work flow chart does not, as some of Chapman's argument suggests, describe HMBI staffing of the entire contract but rather describes proposed staffing in one particular area. *See* HMBI's Reply at 4. HMBI further asserts that its initially proposed organizational structure, *see* AR at 703, 724 (HMBI's initial proposal dated 9/4/03), was significantly revised after its discussions with HUD, *see* AR at 1162, 1485 (HMBI's final proposal revisions dated 4/8/04 and 6/9/04).

HMBI acknowledges that, in responding to HUD's discussion questions, it occasionally referred to the more stringent requirements for a proposal submitted by an 8(a) small business concern rather than the slightly different requirements for a proposal submitted by a non-8(a) small business. *See* Transcript of 12/20/04 Oral Argument (Oral Arg. Tr.) at 71:12–20 (statement of HMBI's counsel). HMBI explains that the confusing responses in its proposal concerning HMBI's compliance with 8(a) standards resulted from its submission of a number of proposal for various contracts under the Solicitation, some of which were 8(a) set-aside contracts and some of which were not. *Id.* at 71:21–24 (statement of HMBI's counsel).

Moreover, with respect to Chapman's allegations concerning HMBI's reliance on Best Assets' computerized databases, HMBI explains that "[t]he cost of an electronic database and property management applications do not represent labor or personnel costs considered in the calculation of the limitation on subcontracting clause." HMBI's Sur–Reply at 5 (citing *Sys. Automation Corp.*, SBA

No. 3497, 1991 WL 150150 (S.B.A. Aug. 1, 1991) and *Wei Chen d/b/a Bogie's Restaurant*, SBA No. 3389, 1990 WL 260235 (S.B.A. Dec.12, 1990)).

HMBI argues that, having considered the relevant factors, HUD "acted reasonably" in concluding that HMBI's proposal, on its face, complied with the limitation on subcontracting clause of the Solicitation. *Id.* at 4–5 (citing *Advanced Data Concepts*, 216 F.3d at 1057–58 (stating that the "arbitrary and capricious standard applicable [in bid protest actions] is highly deferential [and] ... requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.")).

As referenced in the parties' briefing, the SBA's mentor-protégé program is described in 13 C.F.R. § 124.520 (2004).[9] Participation in this program permits a protégé, a firm characterized, in part, by having never received an 8(a) contract, *see* 13 C.F.R. § 124.520(c)(ii), to rely on a mentor, an entity that may be a large business, *see* 13 C.F.R. § 124.520(b), for various types of technical, management and financial assistance as well as assistance in the performance of government contracts in the form of joint venture arrangements, 13 C.F.R. § 124.520(a). While HMBI's participation in the program does contemplate HMBI's reliance on Best Assets' assistance in the performance of an awarded contract, HMBI's participation in the program does not vitiate the limitation on subcontracting requirement under the Solicitation.

In evaluating whether HMBI's proposal complies with the limitation on subcontracting requirement, the court finds the decisions of the Comptroller General addressing this issue to be instructive.[10] In *Coffman Specialties, Inc.*, the Comptroller General stated:

---

9. The regulation states:
 The mentor/protege program is designed to encourage approved mentors to provide various forms of assistance to eligible Participants. This assistance may include technical and/or management assistance; financial assistance in the form of equity investments and/or loans; subcontracts; and/or assistance in performing prime contracts with the Government in the form of joint venture arrangements. The purpose of the mentor/protege relationship is to enhance the capabilities of the protege and to

improve its ability to successfully compete for contracts.
13 C.F.R. § 124.520(a).

10. While not binding authority on this court, the decisions of the Comptroller General are instructive in the area of bid protests. *See Planning Research Corp. v. United States*, 971 F.2d 736, 740 (Fed.Cir.1992); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 61 Fed.Cl. 175, 182 n. 9 (2004); *Filtration Dev. Co., LLC v. United States*, 59 Fed.Cl. 658, 664 n. 11 (2004).

As a general matter, an agency's judgment as to whether a small business offeror will comply with the subcontracting limitation is a matter of responsibility, and the contractor's actual compliance with the provision is a matter of contract administration. However, *where a proposal, on its face, should lead an agency to the conclusion that an offeror could not and would not comply with the subcontracting limitation, we have considered this to be a matter of the proposal's technical acceptability;* a proposal that fails to conform to a material term and condition of the solicitation, such as the subcontracting limitation, is unacceptable and may not form the basis for an award.

B–284546, B–284546.2, 2000 WL 572693, at *4 (Comp.Gen. May 10, 2000) (emphasis added). *See also Ecompex, Inc.*, B–292865.4, B–292865.5, B–292865.6, 2004 WL 1675519, at *4 (Comp.Gen. June 18, 2004) (same); *KIRA, Inc.*, B–287573.4, B–287573.5, 2001 WL 1073392, at *3 (Comp.Gen. Aug. 29, 2001) (same). Here, the court examines HMBI's proposal to determine whether it complied with the limitation on subcontracting requirement.

The record indicates that HMBI's initial proposal provoked written discussions with HUD regarding the relationship between HMBI and its proposed subcontractor Best Assets. *See* AR at 980–87, 1237–42, 1559–63, 1586–90 (HUD's discussion letters to HMBI dated 4/2/04, 4/26/04, 5/21/04, 6/8/04). In its analysis of HMBI's initial proposal, HUD identified HMBI's relationship with Best Assets as a "significant weakness." *Id.* at 927. The Technical Evaluation Panel (TEP) stated that the success of the contract appear to be " 'almost exclusively contingent upon the offeror's subcontract relationship with [Best Assets].' " *Id.* HUD addressed this particular aspect of HMBI's proposal by posing written discussion questions to HMBI asking about the key personnel of both HMBI and Best Assets, HMBI's subcontract management, and HMBI's plan to comply with the limitation on subcontracting requirement. *See id.* at 981, 983 (HUD's discussion letter to HMBI dated 4/2/04). HMBI responded to HUD's questions and stated that it planned to employ at least 50% of its own personnel

to perform the management and marketing services. *Id.* at 1223. HMBI also stated that it would conduct quarterly audits to ensure its compliance with the limitation on subcontracting. *Id.* HMBI obtained and provided a copy of its signed commitment letter from the proposed subcontractor Best Assets and addressed its "contingency plan to guarantee performance" in the event of a termination of its relationship with Best Assets. *Id.* at 1141. In its final proposal revision, HMBI represented to HUD that an "HMBI [c]ontract [m]anager [would] directly manage [Best Asset's] performance as a key subcontractor." *Id.* at 1442. According to the organizational chart included in HMBI's final proposal revision dated June 9, 2004, the contract manager would oversee the activities of the alternate contract manager, the subcontractor Best Assets, and administration. *Id.* at 1485. HMBI identified Mr. James Casey, an employee of a national opinion research center, as its proposed contract manager. *See id.* at 1474, 1478.

In its evaluation of HMBI's final proposal revision, the TEP stated that HMBI's responses to HUD's discussion questions "provide[d] job descriptions for seven (7) senior HMBI personnel who make up the Executive Management Team," "clarifie[d] the [organizational] chain of command," limited the tasks being performed by Best Assets to "mortgagee compliance, property management and providing the electronic management system," and indicated that the property manager, the alternate property manager, a senior property manager and three new HMBI employees would work in the contact area office. *Id.* at 1676 (TEP's evaluation of HMBI's final proposal revision). The TEP observed that HMBI's final proposal revision "represent[ed] a major change from the original proposal that better supports the ability of HMBI to perform fifty-one percent (51%) of the work as required by the Small Business Administration of a prime 8(a) contractor." *Id.* The TEP concluded that "[t]he revised organization structure clearly delineates the roles and responsibilities of the parties and provides a feasible management structure that generally demonstrates [HMBI's] ability to perform the work [of the Illinois–Indiana contract]." *Id.*

The record in this case shows that HUD was unable to determine from the face of HMBI's initial proposal whether or not it complied with the limitation on subcontracting requirement. The record also shows that, after discussions with HUD specifically addressing the division of responsibilities between HMBI and Best Assets, HMBI submitted a final proposal revision that, on its face, satisfied HUD that HMBI was able to comply with the limitation on subcontracting requirement. While the record reflects some confusion in HMBI's proposal and in HUD's discussion questions regarding whether HMBI would comply with certain regulatory standards required of an 8(a) contractor, specifically the requirement limiting the amount of costs that could be incurred by a subcontractor during the initial six months of the contract, *see* 13 C.F.R. § 124.510(c)(1), that confusion does not appear to have impaired HUD's evaluation of whether HMBI's proposal, on its face, demonstrated a likelihood of compliance with the limitation on subcontracting requirement. Based on a review of the record, the court cannot find that HUD's reliance on HMBI's representations in its final proposal revision that it would provide at least 50% of the contract performance was either irrational or contrary to law. *See Galen Med. Assocs.*, 369 F.3d at 1329.

### C. The Bond Requirement

■ The Solicitation includes a Performance and Payment Bonds clause that incorporates the pertinent provisions of FAR § 52.228–16,[11] *see* AR at 140–41 (Performance and Payment Bonds—Other than Construction Clause). With respect to the amount of the bonds, the Solicitation, as amended by Amendment 6, states, in pertinent part:

> HUD is entrusting the Contractor with the care of valuable government property. Therefore, for the protection of the Federal Government and persons supplying labor or materials for the work under this P[erformance] W[ork] S[tatement], the Contractor shall furnish a performance and a payment bond, or the Contractor may furnish the alternatives to performance and payment bonds described in FAR [§ ] 28.204. The *Contractor shall furnish a performance bond* (Standard Form 1418) for the protection of the Government *in an amount equal to (2%) percent of the original contract price and* [12] *a payment bond* (Standard Form 1416) *in an amount equal to (2%) percent of the original contract price.*

AR at 463 (Performance and Payment Bonds—Other than Construction Clause) (footnote and emphasis added); *see also id.* at 140. Consistent with FAR § 52.228–16, the Solicitation defines the "original contract price" for indefinite quantity contracts as *"the price payable for the specified minimum quantity."* [13] *Id.* at 140 (emphasis added).

11. FAR § 52.228–16 addresses the performance and payment bonds required for non-construction contracts. It provides that "[t]he Contractor shall furnish a performance bond (Standard Form 1418) for the protection of the Government in an amount equal to _____ percent of the original contract price and a payment bond (Standard Form 1416) in an amount equal to _____ percent of the original contract price." FAR § 52.228–16(b).

12. The Solicitation as originally issued included the conjunction "or," while the FAR uses the conjunction "and." *Compare* AR at 140 *with* FAR § 52.228–16(b). During the November 18, 2004 telephonic status conference with the parties, HUD indicated that the change in conjunction from "and" to "or" "was not intentional." 11/18/04 Tr. at 20 (statement by HUD counsel, Ms. Rachel Blackburn). In fact, this error was subsequently corrected in Amendment 6. *See* AR at 463 (showing the conjunction "and" in boldface type in place of the conjunction "or" in paragraph (b) of the amended performance and payment bonds clause).

13. With respect to the form that the bonds could take, paragraph (e) of the performance and payment bonds clause in the Solicitation provides that:

> The bonds shall be in the form of firm commitment, supported by corporate sureties whose names appear on the list contained in Treasury Department Circular 570, individual sureties, *or by other acceptable security such as* postal money order, certified check, cashier's check, *irrevocable letter of credit,* or in accordance with Treasury Department regulations ....

AR at 141 (paragraph (e) of the performance and payment bonds clause in the Solicitation) (emphasis added).

With respect to the time for furnishing the bonds, paragraph (c) of the performance and payment bonds clause in the Solicitation required each Contractor "[to] furnish all executed bonds, including any necessary reinsurance agreements, to the Contracting Officer, *within 10 days following the effective date of the contract, but in any event, before starting work.*" *Id.* at 141 (paragraph (c) of the performance and payment bonds clause in the Solicitation) (emphasis added).

Amendment 4 to the Solicitation "changed," *see* AR at 297, paragraph (c) of the performance and payment bonds clause to enlarge the period of time, from 10 days to 30 days, within which the contractor was required to furnish the bonds. *See id.* Amendment 4 also defined the phrase "starting work" to give consideration to the time at which the contractor began performance of certain contract services. *See id.* As amended by Amendment 4, paragraph (c) of the payment and performance bonds clause required the Contractor

> [to] furnish all executed bonds ... to the Contracting Officer, *within 30 calendar days following contract award,* but in any event, before starting work. For the purposes of this clause, *"starting work" means the 61st day after contract award when the Contractor shall begin performance of all contract services related to Conveyances, Custodial Properties, Preconveyance Approvals and Pending Mortgagee Requests.*

*Id.* at 297 (Amendment 4 to the Solicitation)(emphasis added). Amendment 6 to the Solicitation "added," *id.* at 290, the following sentence to the end of paragraph (c) of the performance and payment bonds clause:

> For purposes of this clause, "starting work" means the 61st day after the contract award date *unless otherwise extended by the Contracting Officer.*

*Id.* at 290 (Amendment 6 to the Solicitation) (emphasis added).

Chapman contends that HMBI provided bonds in an insufficient amount and provided the bonds too late. *See* Pl.'s Br. at 8, 16–17. Chapman argues that HMBI was required to post its bonds no later than October 1, 2004 because that date is the 61st day after the July 30, 2004 contract award. Pl.'s Opp. at 5 & n. 4 (correcting miscalculation of date in its opening brief); *see also* Pl.'s Br. at 8, 16. Chapman argues that, based on the original contract price of $42,194,152.00, HMBI was required to provide a performance bond and a payment bond, each in the amount of $843,883.00.[14] *Id.* at 8; Oral Arg. Tr. at 97:16–19. Chapman asserts that because the letter of credit furnished by HMBI in the amount of $843,883.00 on October 28, 2004, *see* AR at 2530, was too little and too late, Chapman is entitled to have its protest sustained. *See* Pl.'s Br. at 8, 17; Pl.'s Opp. at 5 & n. 4 (correcting miscalculation of date in its opening brief). The court disagrees.

As an initial matter, the court is not persuaded that a deficiency by a contractor in meeting a bonding requirement after contract award, even if proven, would, in general, or in this case in particular, constitute "a significant, prejudicial error in the procurement process." *See Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999) (internal quotation and citation omitted). The main defect in the argument that the failure to meet a bonding requirement is a defect in the procurement process is that the issue arises, as it did here, after the procurement is completed. The Comptroller General has several times been called on to address similar claims in bid protests and consistently has found that compliance with bonding is a matter of contract administration. *See Chapman Law Firm,* B–293105.6, B–293105.10, B–293105.12, 2004 WL 2675542, at * 5 (Comp.Gen. Nov.15, 2004) (in which GAO rejected Chapman's argument that HUD failed to enforce the bonding requirement against HMBI); *Aegis As-*

---

14. At oral argument, Chapman asserted that the proper method of calculating the required payment and performance bonds is

by taking two percent of the awarded price per year, so for the first year you'd take the first year awarded price and multiply by .02 to get the performance bond. You'd do the same on

[the payment bond].... I define[ ] ... the original contract price ... [as] each year's price.

Oral Arg. Tr. at 96:16–25. Plaintiff's proposed method is at odds with the definition of "original contract price" in the Solicitation, AR at 140, and FAR § 52.228–16 as the "price payable for the specified minimum quantity."

*socs., Inc.*, B–238712, B–238712.2, 1990 WL 278045, at *1 (Comp.Gen. May 31, 1990) (finding no GAO bid protest jurisdiction where no evidence that adequacy of contractor's bond was an issue prior to contract award and where contractor's failure to satisfy its post-award bonding requirements prompted the agency to terminate the contract for default, but noting that matters involving contract administration are to be resolved in another forum).

The court also notes that no bonding requirements were altered during the Solicitation process for HMBI. Indeed, at HUD's request, *see* AR at 983 (HUD discussion letter to HMBI dated 4/2/04), HMBI verified its ability to meet the security requirements of the Solicitation, *see* AR at 1223, 1230, 1453–54, 1456 (HMBI's responses dated 4/8/04 to HUD's discussion questions).

Nor is the court persuaded that this case should be governed by the decision of this court in *Cardinal Maintenance Service, Inc. v. United States*, 63 Fed.Cl. 98 (2004), a case which arose as a post-award bid protest and which also addressed whether certain post-award actions by the Air Force during contract administration constituted "cardinal changes" to the contract. *Id.* at 106. The court in *Cardinal Maintenance* considered multiple factors to determine whether a cardinal change had occurred, including whether the post-award modifications changed, *inter alia,* "the type of work, [the] performance

period,[15] [or] the costs [required by the Solicitation as amended]." *Id.* (listing these criteria as "factors" determining the materiality of a modification). Any delay in posting the bonds here (as discussed below, the only colorable defect in HMBI's performance) would not rise to the level of a cardinal change.

Nor is there any substantial case to be made that HMBI failed to post security in the amount required under the Solicitation. Consistent with the terms of the Solicitation and the awarded contract, HMBI submitted "acceptable security" in the form of a "letter of credit." *See* AR at 141; 463; *see also supra* n. 13. The total amount of "security" required by a contractor under the payment and performance bonds clause of the Solicitation is four percent of the "original contract price," defined for indefinite quantity contracts as the "price payable for the specified minimum quantity." *Id.* at 140; *see also supra* n. 14. Under the Solicitation, the "price payable for the specified minimum quantity" is calculated by adding up HMBI's management fee (a fixed fee per HUD-owned property for management) and HMBI's marketing fee (a fixed percentage of the average net sales price for marketing and sale of property), *id.* at 243, for each of the 2142 properties determined by HUD to be the minimum annual quantity of properties requiring management and marketing services under the Illinois–Indiana contract, *id.* at 347.[16] Four percent of the calculated "price

15. From the list of factors considered in determining the materiality of the modification, the court understands that the "performance period" contemplated in *Cardinal Maintenance* is the period of performing the work required under the contract. *See Cardinal Maint.*, 63 Fed.Cl. at 102, 106. The work required under the Solicitation here is management and marketing services for HUD-owned properties, not the posting of payment and performance bonds.

16. As the "original contract price" in the calculation of the payment and performance bond amounts owed under the Solicitation, HMBI appears to have relied on the sum identified under the "not-to-exceed limitation" clause in the Solicitation as "[t]he total amount of funds currently available for the payment of work performed under [the Illinois–Indiana] contract." *See* AR at 347 ("not-to-exceed limitation" clause in the Solicitation). That sum is $42,192,152. *Id.* In its letter to HUD referencing its letter of credit

submitted in lieu of a bond, HMBI stated that it had "forwarded an original copy of [its] ... Letter of Credit ... in the amount of $843,883.00 ... to meet [its] [t]wo [p]ercent (2%) bond requirement" for the Illinois–Indiana contract. AR at 2530 (HMBI's letter to HUD dated 10/28/04 referencing the submission of its letter of the credit to HUD).

Chapman's argument that the amount of security furnished by HMBI is insufficient is at odds with Chapman's apparent understanding of the Solicitation revealed in the Administrative Record. As did HMBI, Chapman appears to have relied on the sum set forth in the "not-to-exceed limitation" clause in the Solicitation as the "original contract price" in its calculation of the "full" bond amount owed by HMBI. But while Chapman argues here that HMBI tendered only half of the bond amount owed under the Solicitation, the record indicates that Chapman itself obtained a bond in the amount of only $400,000 to satisfy the payment and performance bonding

payable for the specified minimum quantity" is \$156,086.25. HMBI provided a letter of credit in the amount of \$843,883.00. AR at 2530. The court finds that, consistent with the terms of the Solicitation and the awarded contract, HMBI furnished to the contracting officer more than the minimum acceptable security to satisfy the payment and performance bonds requirement. *See* AR at 140, 463.

The only remaining issue is whether HMBI timely complied with the bonding requirement. Chapman contends that, under the Solicitation, tender of the bond was due "no later than the 61st day after contract award" and that requirement was not tolled by "periods of non-performance relating to bid protests." Pl.'s Opp. at 5.

HMBI contends that it satisfied its bonding requirement "well within the 61–day outer limit ... established for 'starting work' under the [S]olicitation [as amended by Amendments 4 and 6]" because it submitted its letter of credit (in lieu of bonds) to HUD after completing "a total of 47 days" of work. HMBI's Mot. at 11.

Defendant contends that HMBI has "fully complied with the bonding requirements contained in the [S]olicitation." Def.'s Mot. at 14. Alternatively, defendant argues that if the contractor is not performing work under the contract, there is no risk of property damage or non-payment for labor and materials and thus the contractor need not post the performance and payment bonds which are required of a contractor performing work under the contract. *See* Def.'s Reply at 5. Defendant asserts that, consistent with the FAR provision which directs a contractor to "take all reasonable steps to minimize the incurrence of costs allocable to ... work" during a stop-work order,[17] FAR § 52.233–3(a), HMBI's "obligation to secure bonding in a timely manner should not be read to con-

flict with its concurrent contractual obligation not to incur costs" following the contracting officer's issuance of the stop-work order in this case. Def.'s Reply at 5–6 (citing *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 351 F.2d 972, 979 (1965)) (encouraging contract "interpretation which gives a reasonable meaning to all parts of an instrument").

The date of contract award was August 1, 2004. AR at 345 (Award of Contract). The record indicates that contract performance was begun immediately and then suspended for fifteen days, from August 17, 2004 through August 31, 2004, in accordance with the stop-work order issued by the contracting officer after Chapman filed its GAO protest. *See* AR at 2477 (stop-work order issued by HUD to HMBI dated 8/26/04); *Chapman I,* 62 Fed.Cl. at 465. Contract performance was suspended again for fifty-four days, specifically from October 1, 2004 through November 23, 2004, in connection with Chapman's bid protest before GAO.[18] However, the contracting officer did not issue a stop work order during the fifty-four day suspension. On October 28, 2004, HMBI furnished HUD with a letter of credit. *See* AR at 2530, 2699 (cover letter dated 10/28/04 from HMBI to HUD accompanying HUD's letter of credit to satisfy its bonding requirement and e-mail dated 10/21/04 from HMBI to HUD referencing concurrent fax transmission of confirmation letter from bank regarding letter of credit in lieu of bonds for the bond requirement).

The date on which HMBI furnished its letter of credit to HUD was eighty-eight calendar days after the date of contract award. Based on a reading of the Solicitation that limits "starting work" to a sixty-one day period of time after contract award, an interpretation urged by plaintiff in this case, HMBI's tender of its letter of credit appears to be late. However, Chapman has failed to

requirements under the Solicitation. *Id.* at 1265 (letter from Chapman to indemnity company dated 4/29/04 regarding \$400,000 bond for "the HUD project").

17. The FAR provision is incorporated into the Solicitation. AR at 459.

18. On October 1, 2004, this court ordered that contract performance be stayed pending adjudi-

cation of the GAO protest. *See Chapman I,* 62 Fed.Cl. at 469. That stay continued through November 23, 2004, at which time this court entered judgment in *Chapman II* and lifted the stay of performance directed by its prior Order dated October 15, 2004. *See Chapman II,* 63 Fed.Cl. at 28 n. 3.

address how the phrase "when the Contractor shall begin performance of all contract services related to Conveyances, Custodial Properties, Preconveyance Approvals and Pending Mortgagee Requests" affects the sixty-one day period of time after contract award. Chapman has failed to introduce any evidence regarding whether the work begun by HMBI during its forty-seven days of contract performance is among the types of "contract services related to Conveyances, Custodial Properties, Preconveyance Approvals and Pending Mortgagee Requests" described in the Solicitation. Even if a violation of the timing requirement could somehow be construed as a "significant, prejudicial error in the procurement process," *Alfa Laval Separation,* 175 F.3d at 1367, a finding the court does not make, Chapman has failed to carry its burden of proof to establish a violation of the timing requirement for furnishing the performance and payment bonds under the Solicitation. *See* 28 U.S.C. § 1491(b)(1); *Impresa,* 238 F.3d at 1332. Moreover, Chapman has failed entirely to show how "there was a 'substantial chance' [that] it would have received the contract absent the alleged error." *Banknote Corp.,* 365 F.3d at 1351 (quoting *Emery Worldwide Airlines,* 264 F.3d at 1086).

### D. HUD's Discussions with Chapman

Chapman complains that HUD failed to conduct proper discussions on the subjects of Chapman's marketing plan, and Chapman's prior experience and past performance. *See*

Pl.'s Br. at 9–13. Alleging "[d]isparate [t]reatment" by HUD in its evaluation of the proposals submitted by Chapman and HMBI, *see* Pl.'s Opp. at 3, Chapman asserts that, unlike HMBI, it "was not given repeated opportunities to address the concerns the Government had with its proposal," *id.* at 4.

Chapman states that "during the course of the procurement, HUD engaged Chapman in [w]ritten [n]egotiations, [a]dditional [w]ritten [n]egotiations, [r]eopened [n]egotiations dated April 27, 2004 and [r]eopened negotiations dated May 21, 2004." Compl. ¶ 15. Chapman alleges that it "fully and satisfactorily" replied to the written negotiations, which identified four possible weaknesses and four possible significant weaknesses. *Id.* ¶ 16. Chapman asserts that the additional written negotiations and the reopened written negotiations "did not identify *any* weaknesses or significant weaknesses but only identified discussion items," to which it fully responded. *Id.* ¶¶ 16, 18. Chapman argues that its technical proposal score was "unfairly downgraded," Compl. ¶ 31, to "an overall rating of 'fair' with a moderate risk assessment," *see* AR at 2326 (Chapman's GAO protest), on issues that it had addressed during discussions and that the government never presented again, Compl. ¶ 31. Chapman complains that "contrary to the statements in HUD's repeated discussion letter[s],[19] the [p]ost [a]ward [d]ebriefing states that there were *five* significant weaknesses in the Chapman's proposal, including two significant weaknesses that were *never before raised as issues.*"[20] *Id.*

---

**19.** Plaintiff's complaint refers to the following language appearing in each discussion letter from HUD to Chapman:

> Your written responses to the additional written negotiations/discussion should address *only* the areas set forth above and shall be submitted and delivered in the same format and same number of copies as stated in Section L.2 of the RFP. *Your written response to the written negotiations/discussions will constitute conclusion of negotiations/ discussions.*

AR at 1233, 1555, 1583 (discussion letters to Chapman from HUD dated 4/17/04, 5/21/04, and 6/8/04).

**20.** Chapman observes that the following weaknesses were identified in its debriefing letter from HUD:

> (1) Management Capability and Quahty of Proposed Management Plan—no "coherent strategy for ensuring accurate property value,"

Compl. ¶ 21, failure to identify key management controls, *id.; see also* AR at 1641, and poorly detailed strategies for the preliminary marketing plan, Compl. ¶ 21.
> (2) Past Performance—no significant weaknesses identified. Compl. ¶ 21,
> (3) Prior Experience—no described experience by the joint venture partners or key subcontractors relevant to the required property management tasks. Compl. ¶ 21.
> (4) Proposed Key Personnel—"fail[ure] to identify qualified management staff at the Contract Area Office [and] ... fail[ure] to provide a clear, detailed and feasible staffing plan." Compl. ¶ 21.
> (5) Subcontract Management—no significant weaknesses identified. Compl. ¶ 21.
> (6) Small Business Subcontracting Participation—no significant weaknesses identified. Compl. ¶ 21.

¶ 20 (footnote added). Chapman alleges that, in its debriefing letter after the contract award, HUD for the first time identified as "weaknesses" the preliminary quality control plan and preliminary marketing plan proposed by Chapman as part of its Management Capability and Quality of Proposed Management Plan. Compl. ¶ 21 n. 1.

Defendant asserts that "Chapman's [improper discussions] argument rests upon a fundamental misapprehension of the role of negotiations," Def.'s Mot. at 5, and the erroneous "premise that a contracting officer must conduct discussions until all problems are resolved," Def.'s Opp. at 7 (citing *Labat–Anderson, Inc. v. United States,* 42 Fed.Cl. 806, 835 (1999) (stating that "agencies are not obligated to conduct all-encompassing discussions, that is, to address in express detail all inferior or inadequate aspects of a proposal.")). Defendant argues that "the mere fact that HUD did not request additional information from Chapman [about the identified deficiencies] after receiving Chapman's replies did not somehow 'resolve' HUD's concerns as a matter of law, or otherwise prevent HUD from relying upon [the identified] concerns in making its final assessment of Chapman's proposal." Def.'s Mot. at 5. Defendant contends that "HUD acted entirely consistently with its obligations under [FAR § 15.306(d), the regulatory provision governing discussions]." *Id.* at 6.

HMBI contends that, contrary to Chapman's allegations that two significant weaknesses in Chapman's proposal were never addressed during discussions but were first identified during post-award debriefing, HMBI's Mot. at 2–3 (citing Compl. ¶¶ 20–21, 31), HUD identified the two weaknesses during discussions with plaintiff, *id.* at 3. HMBI points out that, prior to debriefing, HUD not only drew to Chapman's attention the two weaknesses that Chapman alleges were previously unidentified-specifically, the lack of "key management controls or corrective actions" in Chapman's preliminary quality control plan and the "poorly detailed" strategies in Chapman's preliminary marketing plan-but also afforded Chapman an opportunity to respond. *Id.* at 3. HMBI asserts that Chap-

*See* Compl. ¶ 21; AR at 1634, 1652–53, 1659–61.

man's argument that HUD failed to hold meaningful discussions is based on unsupported allegations. HMBI's Opp. at 7.

The FAR defines "negotiations" as "exchanges . . . between the Government and offerors[ ] that are undertaken with the intent of allowing the offeror to revise its proposal." FAR § 15.306(d). The FAR provides:

> When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions . . . . Discussions are tailored to each offeror's proposal, and must be conducted by the contracting officer with each offeror within the competitive range . . . . At a minimum, the contracting officer must [subject to certain privacy limitations], indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. However, the contracting officer is not required to discuss every area where the proposal could be improved.

FAR § 15.306(d)(1),(3). In *Labat–Anderson,* this court stated that "agencies are not obligated . . . to address in express detail all inferior or inadequate aspects of a proposal." 42 Fed.Cl. at 835. While the FAR does not permit "[g]overnment personnel involved in [an] acquisition [to] engage in conduct that . . . [f]avors one offeror over another," FAR § 15.306(e)(1), the "scope and extent of discussions" between the contracting officer and an offeror are "a matter of contracting officer judgment," *id.* at § 15.306(d)(3).

The record indicates that HUD afforded Chapman multiple opportunities to address the weaknesses identified in its proposal and that, in each instance, Chapman responded. *See* AR at 970 (discussion letter from HUD to Chapman dated 4/2/04), AR at 988 (Chap-

man's response dated 4/8/04), AR at 1231 (discussion letter from HUD to Chapman dated 4/27/04), AR at 1564 (Chapman's response dated 5/24/04), AR at 1582 (discussion letter from HUD to Chapman dated 6/8/04), and AR at 1591 (Chapman's response dated 6/9/04). The court now examines whether legally adequate discussions were conducted on the subjects about which Chapman has specifically complained.

### 1. Chapman's Marketing Plan

■ With respect to Chapman's claim that HUD failed to conduct proper discussions on the subject of its marketing plan, the record indicates that HUD twice inquired during written discussions about whether Chapman fully understood the marketing requirements under the Solicitation. During written discussions with Chapman by letter dated April 2, 2004, HUD identified as a significant weakness Chapman's preliminary quality control plan because it "fail[ed] to identify key management controls, corrective actions, or describe how [Chapman's quality control] procedures will ensure compliance with HUD's minimum performance standards." AR at 972, 974. Chapman responded to this concern by letter dated April 8, 2004. *See* AR at 988, 1005–06.

Nearly four weeks later, by letter dated April 27, 2004, HUD again informed Chapman that "[its] response to Factor 1, Significant Weakness 1, relative to the preliminary Quality Control plan fail[ed] to identify corrective actions that w[ould] be utilized and only identifie[d] a few management controls." AR at 1232. Chapman responded to this particular concern by letter dated May 3, 2004. AR at 1243, 1251.

Additionally, during written discussions by letter dated April 2, 2004, HUD identified to Chapman twenty-nine discussion items, *see* AR at 973–75, one of which specifically addressed Chapman's preliminary marketing plan, *id.* at 974, ¶ 9. HUD stated that Chapman's preliminary marketing plan failed to articulate clearly the sales process, by, among other omitted details, "not identify[ing] how long properties [would] be listed and when bids [would] be opened[,] ... [and] not outlin[ing] how [Chapman would] select

or compensate listing brokers or what services brokers [would] provide beyond holding open houses." *Id.* Chapman responded by letter dated April 8, 2004. *See* AR at 988, 996–1002, 1020.

During additional discussions by letter dated April 27, 2004, HUD again questioned whether Chapman "fully underst[ood]" the marketing requirements under the Solicitation's performance work statement and asked Chapman to explain how its marketing plan to hire statewide listing brokers complied with the performance work statement requirement that local listing brokers "be located within a reasonable proximity to the listed property." AR at 1231. Chapman responded by letter dated May 3, 2004 stating that it would strive to improve management and marketing services by "utiliz[ing] knowledgeable geographically proximate brokers who are familiar with their respective communities." *Id.* at 1243, 1246.

Notwithstanding these discussions, the TEP concluded that Chapman's preliminary plans were missing "an understanding of the dynamics of orchestrating a large housing management and marketing operation" and that "too many holes [existed] in [Chapman's] description of specific [management and marketing] procedures." AR at 1700. The TEP observed that, while the preliminary marketing plan "responds to most of the minimum tasks" set forth in the performance work statement, it "does not address many of the mechanics of marketing and sales described in the [performance work statement]." *Id.* at 1704. The TEP concluded that one weakness of the preliminary marketing plan was Chapman's "failure to clearly articulate the sales process," by, among other omissions, "not identify[ing] how long properties [would] be listed and when bids [would] be opened ... [and] not outlin[ing] how [Chapman would] select or compensate listing brokers or what services brokers [would] provide beyond holding houses." *Id.* at 1705.

The TEP also determined that Chapman's preliminary quality control plan "demonstrate[d] a limited ability to implement some quality control measures." *Id.* at 1705. The TEP stated that Chapman's "failure to iden-

tify specific key management controls, to acknowledge HUD's performance standards as a required basis for such controls or to provide an organized set of quality control tasks or procedures is a significant weakness because it presents a high risk to HUD of Offeror's failure to identify problems that occur and to achieve HUD's performance standards as described in the [performance work statement]." *Id.* at 1706. The TEP noted that, while Chapman "[did] describe the importance of corrective actions" in its written discussion letters, Chapman "[did] not clearly state" its plans for remedying the identified problems in its proposal. *Id.*

The record shows that, contrary to Chapman's allegations, HUD conducted discussions with plaintiff that were consistent with the agency's obligations under FAR § 15.306(d). HUD "indicate[d] to ... each offeror still being considered for award [here Chapman and HMBI], [the] deficiencies ... [and] significant weaknesses [in their proposals]." FAR § 15.306(d)(3). HUD also "discuss[ed] other aspects of [Chapman's] proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award." *Id.* Chapman's allegations that HUD failed to conduct proper discussions by failing to point out certain weaknesses in its proposal or by failing to address the weaknesses more than once during discussions, *see* Pl.'s Br. at 9; Pl.'s Opp. at 4, are unsupported by the record and do not establish a violation of law, *see* FAR § 15.306(d). Moreover, while plaintiff complains that it was downgraded for issues raised by HUD that it addressed, Chapman does not allege that the TEP's technical evaluation was irrational, arbitrary or capricious. *See* Pl.'s Br. at 9; Pl.'s Opp. at 4.

2. Chapman's Prior Experience and Past Performance

■ With respect to Chapman's claim that HUD failed to conduct proper discussions on the subject of prior experience and past performance, plaintiff alleges that HUD "unfairly discredited [Chapman's] prior experience

and past performance" while assigning a "good" rating for Factor 3[21] (Frior Experience) to HMBI, "which ha[d] no prior experience of its own related to the [performance work statement] requirements, ... based *exclusively* on the prior experience of its major subcontractor Best Assets." Pl.'s Br. at 11. In evaluating Chapman's final proposal revision, the TEP stated:

> [Chapman] substantially changed its organization[al] structure from a joint venture to a legal corporation with Frank Chapman as its President and many of the principals of the original joint venture as management employees. Because of this change[,] the prior experience of key personnel cannot be considered, as Factor 3 considers only the experience of the organization and its major joint venture or major subcontract partners.
>
> One of the joint venture partners that was removed from [Chapman's initial] organizational chart is George Tustin of Tustin and Company. Mr. Tustin's prior experience as a pre-conveyance property manager was considered by the TEP as evidence that [Chapman] had experience similar to both mortgagee compliance and property management. Based on the withdrawal of Tustin and Company, the TEP reviewed the experience of [Chapman] for evidence of prior experience similar to these tasks. Chapman Law Firm has experience in property title review that is similar to one of the many task[s] involved in mortgagee compliance. While not representing the full scope of mortgagee compliance, the *TEP did consider that this experience was marginally similar.* Because this experience is limited to only a portion of the required mortgagee compliance tasks, it is a new weakness. The TEP was unable to identify any experience of Chapman that is similar to the property management tasks. The lack of prior experience similar to property management is a new significant weakness.

AR at 1725 (emphasis added). Chapman asserts that the TEP's consideration of the change in Chapman's organizational struc-

---

**21.** While plaintiff refers to "Factor 2" of the technical evaluation criteria, *see* Pl.'s Br. at 11, Factor 2 concerns past performance. AR at 281. Factor 3 concerns prior experience. *Id.*

ture was "yet another attempt to artificially lower Chapman's rating." Pl.'s Br. at 12. While acknowledging that Mr. Tustin was removed from the organizational chart, Chapman asserts that "he was replaced by Derek Gasioroski, an experienced former state director and property manager for the management and marketing contractor Michaelson, Connor & Boul, [Inc.]" *Id.* By this assertion, plaintiff appears to imply that Mr. Gasioroski's prior experience is commensurate with that of Mr. Tustin and was reviewable. *See id.; see also* AR at 1398. Chapman also appears to argue by implication that because Mr. Tustin was identified in the proposal as a subcontractor with an executed letter of commitment, Mr. Tustin's prior experience was also reviewable. Pl.'s Br. at 12; *see* AR at 1400 (referencing Mr. Tustin's letter of commitment).

Section M.5 of the Solicitation addresses the requirements of the six technical evaluation factors for award. *See* AR at 281–83. Factor 3, the prior experience factor, requires that an offeror's proposal "provide evidence of *the firm's experience as an organization or the experience of its major subcontract partners,* in performing work and providing, during the past five (5) years, deliverables the same as, or similar to, that required by the solicitation." *Id.* at 281 (emphasis added).

In its evaluation of Chapman's final proposal revision, the TEP observed that Mr. Tustin had been removed from Chapman's organizational chart. AR at 1722 (TEP's final evaluation report). The TEP stated that it had relied on "Mr. Tustin's past performance as a[p]re-conveyance property manager ... as evidence that [Chapman] had past performance similar to both mortgagee compliance and property management." *Id.* Although the TEP noted that Chapman's final proposal revision did include a commitment letter from Mr. Tustin's field services firm, the TEP stated that Mr. Tustin's firm, which "[would be] one of many maintenance subcontractors, ... [was] not identified as a major subcontract partner." *Id.*

Chapman acknowledges that it altered its organizational structure, *see* Pl.'s Br. at 12, and that under its reorganized organizational structure, Mr. Tustin was not part of Chapman "as an organization" nor was he identified in Chapman's proposal as a "major subcontract partner," *see* AR at 1400. Contrary to Chapman's assertions, the Solicitation in this case did not require consideration of Mr. Tustin's prior experience.

Chapman's arguments in support of its claim that HUD failed to consider the prior experience of Mr. Gasioroski contradict the evidence in this case. The record shows that in its final proposal revision dated May 3, 2004, Chapman identified Mr. Gasioroski as the manager of field operations in Chapman's organizational chart, *see* AR at 1394, and stated that he would "apply[ ] his years of service with [management and marketing contractor Michaelson, Connor & Boul, Inc.] to the proper management and maintenance of the HUD [h]omes," *id.* at 1398. Chapman also included in its final proposal revision a copy of Mr. Gasioroski's resume. *See id.* at 1426. The TEP stated in its evaluation of Chapman's final proposal revision:

> The resume of Dennis [Gasiorowski], proposed manager of Field Operations indicates that he has five (5) years of experience working for one of HUD's incumbent M & M contractors managing field inspectors and overseeing property management. This experience is similar to the property management requirements of the [Solicitation].
>
> However, [based on the withdrawal of Tustin and Company], the TEP was unable to identify anyone with substantial past performance similar to mortgagee compliance.

*Id.* at 1722 (TEP's evaluation of Chapman's final proposal revision).

Chapman's claim that HUD "unfairly discredited" its prior experience and past performance is contradicted by the record. Plaintiff has failed to establish that HUD acted arbitrarily or inconsistently with the terms of the Solicitation in evaluating its past performance. *See Impresa,* 238 F.3d at 1332–33 (requiring a protester to show a "clear and prejudicial" violation of the applicable law or to establish that the agency acted arbitrarily or capriciously (internal quotation and citation omitted)).

Contrary to Chapman's assertions, the record indicates that, consistent with its obligations under FAR § 15.306(d), HUD "discuss[ed] ... [those] aspects of [Chapman's] proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award." FAR § 15.306(d). Chapman's allegation that HUD failed to conduct proper discussions by failing to continue to inquire about these aspects of its proposal, *see* Pl.'s Br. at 12, is unsupported by the record, and Chapman has failed to establish that HUD violated the law, *see Impresa*, 238 F.3d at 1332.

## III. Conclusion

Because plaintiff has failed to demonstrate either significant errors in the procurement or that it was prejudiced by any alleged errors, it is not entitled to either injunctive relief or damages and its protest shall be DISMISSED with prejudice. The Clerk of the Court shall enter judgment for defendant. No costs.

On or before January 21, 2005, the parties shall file requests for deletion of protected/privileged material from the published opinion to be issued by the court. Each such request shall identify with particularity the proposed deletion and the reason therefor.

IT IS SO ORDERED.